Receipt number AUSFCC-11155131

## UNITED STATES COURT OF FEDERAL CLAIMS

METROPOLITAN TRANSPORTATION
AUTHORITY,

*Plaintiff*,

v.

UNITED STATES OF AMERICA,

*Defendant*.

Case No. _26-422 C_____

**COMPLAINT**

Plaintiff the Metropolitan Transportation Authority (the "MTA") files this complaint against Defendant the United States of America and alleges as follows:

## INTRODUCTION

1.    "New York City is filled with colossal feats of engineering that often come with excruciating delays.  While it was nearly a decade before ground zero was rebuilt, [i]t took nearly a century, 14 mayors, 12 governors, and dozens of transit leaders to complete three new subway stops along Second Avenue" that constituted Phase 1 of New York City's Second Avenue Subway Project, which opened to the public on January 1, 2017.[1]

2.    The MTA is filing this case because it should not take anywhere near that long to finish Phase 2 of the Second Avenue Subway Project ("SAS2" or the "Project"), which began construction in early 2024.  This breach of contract action arises from the United States's failure to honor its commitment to financially support the construction of the second phase, which has already deprived the MTA of nearly $60 million in promised funding *in medias res*.  The United States's breach threatens MTA's ability to remain on schedule, get the new subway tracks and

---

[1] Stephen Nessen, *A Brief History of the Second Avenue Subway Line*, WNYC News (Dec. 16, 2016), https://www.wnyc.org/story/brief-history-2nd-avenue-subway-line/.

stations up and running (and begin earning revenue), and has required the MTA to divert millions of dollars away from other critical transportation projects in order to fill the gap.  By this action, the MTA seeks to compel the United States government to promptly pay what it owes as a result of the government's breach.

3.      The Second Avenue Subway Project is the fulfillment of a longstanding promise to the residents of east Manhattan and Harlem after a century of delay.  As one of New York's most transit-reliant neighborhoods, with 71 percent of its residents using public transportation to get to work (compared to a city-wide average of 56 percent), East Harlem has long suffered from a lack of public transit access.

4.      In Phase 1 of the Second Avenue Subway Project, the MTA extended the Q subway line from 63rd to 96th Street, building additional stations at 63rd, 72nd, 86th, and 96th Streets, and thereby expanding transit access to nearly 200,000 riders each day on the Upper East Side.

5.      Phase 2, which is the subject of this lawsuit, is designed to shorten commutes for more than 100,000 daily riders by extending the Q subway line 1.76-miles into East Harlem and Harlem. As shown below, three modern subway stations at 106th, 116th, and 125th Streets will be constructed, the latter of which will serve as a multi-modal hub connecting riders to the 4, 5, and 6 subway lines and to the Metro-North Railroad.  As the New York Times noted in late 2016 just before the opening of Phase 1: "The Second Avenue line has been on the drawing board since the 1920s and will be the most ambitious expansion of the subway system in a half-century.  It will also be a critical milestone for the [MTA] at a time when both New York's population and the

number of tourists flooding the city have reached record levels, placing enormous pressure on public transit."[2]



*Figure 1: Rendering of Phase 1 and Phase 2 of the*
*Second Avenue Subway*

6.      Recognizing the critical importance of this project, in November 2023, the U.S. Department of Transportation ("DOT") entered into a Full Funding Grant Agreement with the MTA (the "FFGA" or "Agreement"), *see* **Exhibits 1 and 2**, promising to provide federal funding. DOT itself has recognized that the Project will "provide much needed transit access in Manhattan to East Side residents, workers, and visitors,"[3] creating new local jobs and supporting small businesses, thereby generating a "much-needed boost" to the local economy.[4]  Likewise, United

---

[2] Emma G. Fitzsimmons, *After Almost a Century the 2nd Avenue Subway is Oh-So-Close to Arriving*, N.Y. Times (Oct. 24, 2016), https://www.nytimes.com/2016/10/25/nyregion/after-almost-a-century-second-avenue-subway-is-oh-so-close-to-arriving.html.

[3] FTA, *Second Avenue Subway Phase 2, New York, NY* (Feb. 2024), https://www.transit.dot.gov/sites/fta.dot.gov/files/2024-03/NY-New-York-Second-Avenue-Subway-Phase-2-Profile-FY25.pdf

[4] Hochul, *Phase 2 Announcement*, *supra* n.[2].

States Secretary of Transportation Sean Duffy has not only described the Project as "important," but has stressed the need for it to "move forward and move forward fast."[5]

7.      In the FFGA, DOT agreed to fund 44.2% of the $7,699,030,840 Estimated Net Project Cost, amounting to a "maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution of $3,404,883,991." FFGA at 1, § 8(c).  In exchange, the MTA agreed to provide the remaining amount, calculated as $4,294,146,849, through local funding and "to undertake the activities necessary to Complete the Project." *Id.* § 4, Attach. 6.  DOT's contribution of $3.405 billion represents the second-largest investment of funds appropriated by the Infrastructure Investment and Jobs Act of 2021 ("IIJA") and was awarded via a competitive selection process through the Capital Investment Grants ("CIG") program pursuant to which the federal government assists in financing new fixed guideway (or railway) projects.

8.      In reliance on these binding funding commitments, in January 2024 the MTA awarded a major contract to relocate and upgrade existing infrastructure under the Second Avenue roadway. Similarly, in August 2025, the MTA entered into a $1.972 billion agreement for tunnel boring from 116th to 125th Street—a process involving 750-ton machines equipped with 22-foot diamond-studded drill heads tunneling between 35 to 120 feet below the Second Avenue roadway.

9.      Over the course of the next two years, the MTA implemented the Project (including covering the funding that it promised), and DOT, in turn, honored its funding commitment by issuing reimbursements to the MTA within 30 days of each request (and typically much quicker than that).

---

[5] Chris Marquette, *'We're Not Trying to Shut Down These Projects,' Duffy Insists About NY Tunnels*, Politico (Oct. 7, 2025), https://www.eenews.net/articles/were-not-trying-to-shut-down-these-projects-duffy-insists-about-ny-tunnels/.

10.     Until now, work on the Project has proceeded along the agreed-to schedule and tunnel-boring construction is scheduled to begin in 2027.  Phase 2 of the Project is set to result in the overall creation of more than 70,000 new jobs, including union-wage construction jobs associated with the Project.

11.     That all changed on September 30, 2025, when—on the eve of a federal shutdown caused by a breakdown in budget negotiations between President Trump and the Democrats in Congress—DOT suddenly "suspended" the release of contractually-obligated funds for SAS2.[6] *See* **Exhibit 3** (the "September 30 Letter").  That suspension still remains in effect, without any apparent end in sight, and DOT has already withheld approximately $58.6 million with more to become due soon.

12.     If funding does not resume soon, the MTA will be forced to further divert critical funding from other important transportation projects to cover the shortfall and ensure that the Project remains on schedule.

13.     DOT has given changing and inconsistent explanations for its actions.  In its September 30 Letter, for example, DOT stated that it was "reviewing the projects it funds to ensure nondiscrimination," simultaneous with its issuance of a new interim final rule ("IFR") that modified DOT's own race- and sex-based presumptions of social and economic disadvantage from its Disadvantaged Business Enterprise ("DBE") program.  90 Fed. Reg. 47,969 (Oct. 3, 2025). Shortly after that, however, President Trump made clear that the payments had been suspended in order to put political pressure on Senate Minority Leader Chuck Schumer (D-NY) over the October

---

[6] Samantha Liebman, *Trump Team Puts on Hold $18B in Funding for Hudson Tunnel, Second Avenue subway*, Spectrum News (Oct. 1, 2025), https://ny1.com/nyc/all-boroughs/news/2025/10/01/trump-puts-hudson-tunnel-second-avenue-subway-funding-on-hold.

2025 government shutdown.[7]   DOT similarly portrayed the suspension as an attempt to gain leverage in the government shutdown negotiation, describing it as a "casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal immigrants benefits."[8]   Consistent with this apparent motivation, at the same time that DOT suspended payments for the Second Avenue Subway, it also suspended payments for another major New York (and New Jersey) project—the $16 billion Hudson Tunnel Project that will improve transportation options between New Jersey and New York City by adding a new tunnel under the Hudson River.  *See* Complaint, *Gateway Development Commission. v. United States*, 26 Civ. 176, ECF No. 1 (RAH) (Fed. Cl. Feb. 2, 2026) ("*GDC*") (asserting breach of contract claims for more than $200 million in unpaid funds).  That same week, DOT suspended $1.2 billion in funding earmarked for the Chicago Transit Authority subway extension and modernization projects, a move which was criticized by Illinois Governor Pritzker as an attempt "to score political points" at the cost of the "economy and the hardworking people who rely on public transit to get to work or school."[9]

14.    Whatever the Administration's true motivations may be, there is no question that DOT is in breach of the FFGA.  Under the FFGA, DOT agreed to reimburse the MTA for certain costs incurred in building SAS2 within 30 days of each reimbursement request.  The FFGA only

---

[7] Chris Marquette & Ry Rivard, *Massive NY Tunnel and Subway Projects Still Alive, Official Says Despite Trump's Claims*, Politico (Oct. 16, 2025) ("Trump spoke about ending billions of dollars in "Democrat" programs as a way to make the government shutdown more painful for Senate Minority Leader Chuck Schumer and other Democrats."), https://www.politico.com/news/2025/10/16/gateway-and-second-ave-subway-projects-still-alive-despite-trump-comments-00611371.

[8] Dan Mangan, *Trump Administration Freezes $18 Billion in New York City Infrastructure Projects, Vaught Says*, CNBC (Oct. 1, 2025), https://www.cnbc.com/2025/10/01/trump-new-york-funding-infrastructure-vought.html.

[9] Maggie Dougherty, *Trump Freezes $2.1B For Chicago Transit Projects In Latest 'Punishment' Of Blue States*, Capitol News Illinois (Oct. 3, 2025), https://capitolnewsillinois.com/news/trump-freezes-2-1b-for-chicago-transit-projects-in-latest-punishment-of-blue-states/.

allows DOT to withhold payment in certain narrow circumstances not present here and only after DOT undertakes contractual procedures it has not attempted.

15.    In particular, under Section 19 of the FFGA, if DOT determines that a breach has occurred, it is required to first give the MTA 90 days' written notice and provide a reasonable period of time for the MTA to take corrective action.  Only after that, if the government determines that a breach has occurred, may it suspend payments and drawdowns, but only until any necessary corrective action is completed.  As Judge Hertling stated in the related case *GDC*, the relevant contract provisions mandate that "DOT must follow a 'ready, aim, warning shot, aim again, fire' sequence when exercising its contractual rights." 26 Civ. 176 (RAH), ECF No. 49 at 16 (Fed. Cl. Mar. 12, 2026).

16.    None of that happened here.  Nothing permitted DOT to summarily suspend payments with no notice, no opportunity to be heard, no ability to take corrective action (whatever that might be), and no end date on the horizon.  Indeed, as Judge Hertling stated with respect to an identical letter sent to the Gateway Development Commission on the same day, "DOT's September 30, 2025, letter makes no determination at all, much less any of the determinations required by the agreements and regulations. Instead, DOT announces that it was initiating a 'review' of [the MTA's] program '[i]n conjunction with the issuance of the [IFR] that removed 'race- and sex-based presumptions of social and economic disadvantage from the [DBE] program.' The letter did not identify any breach, noncompliance, or violation of agreement terms or federal law by [the MTA] and did not claim that [the MTA] was out of compliance with its obligations under the agreements or had done anything wrong. The letter simply announced DOT's review and, simultaneously, the suspension of reimbursements. [The MTA] had no prior notice of the

suspension and was not given an opportunity to cure any alleged breach, as required." *GDC*, 26 Civ. 176 (RAH), ECF No. 49 at 17 (Fed. Cl. Mar. 12, 2026).

17.    In other words, rather than follow the "carefully scripted requirements" of the relevant grant agreement, "DOT took a 'ready, fire, aim' approach to its withholding of [the MTA's] disbursements. This approach is facially inconsistent with the requirements imposed by the agreements and applicable regulations." *GDC*, 26 Civ. 176 (RAH), ECF No. 49 at 18 (Fed. Cl. Mar. 12, 2026).

18.    The MTA therefore brings this breach-of-contract action to recover the Project reimbursements that are already due, as well as other consequential damages that DOT's suspension has caused.  This Court can quickly resolve the MTA's claim for breach based on DOT's failure to reimburse $58,643,339.10, and respectfully should do so on an expedited motion for partial summary judgment.  As Judge Lewis Liman of the Southern District of New York recently explained in connection with litigation over the MTA's congestion pricing program:  "[i]t is so obvious that it almost need not be stated that when money is obligated and is not paid as promised, harm follows—debt is incurred, debt is unpaid, and budgets are upended."  *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 691 (S.D.N.Y. 2025) (cleaned up).  That is exactly what is happening here.  If funding is not immediately resumed, it risks creating a "domino effect" of cascading delays and inflated costs.  *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, 2016 WL 4445770, at *11 (C.D. Cal. Aug. 12, 2016) (describing the "domino effect" that delays in subway construction project approvals can have for later phases of the project).  The Court should also ultimately enter judgment for the MTA on its claim for other consequential damages stemming from DOT's breach.

8

## PARTIES

19.     Plaintiff the MTA is a public benefit corporation organized under the laws of New York.  The MTA is responsible for North America's largest public transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, southeastern New York, Northeastern New Jersey, and Southern Connecticut.   An MTA subsidiary, MTA Construction & Development, is the lead agency responsible for the planning, design, and construction of the Second Avenue Subway.  The MTA has offices in New York, New York, and is governed by a 23-member board.

20.     Defendant is the United States of America, acting through DOT, an agency within the Executive Branch of the United States government.

## JURISDICTION

21.     This Court has subject matter jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1).  Monetary relief is also available under the Tucker Act.

## BACKGROUND

**A.     The Second Avenue Subway**

22.     New York City's first subway opened for business in 1904 and the need for and obvious benefits of a Second Avenue subway line were acknowledged almost immediately.  The "roots" of the Second Avenue Subway line "go back to the year 1919, when Consulting Engineer Daniel L. Turner, of the Public Service Commission, launched a study for the comprehensive extension of existing rapid train systems in New York City.  That was the year when peace conferees convened in Paris after World War I … and [when] Sir Barton became the first winner

9

of thoroughbred racing's Triple Crown."[10]  Turner proposed the construction of new subway lines to deal with strain on the subway system, which was already near maximum capacity and had almost doubled to 1.3 billion rides per year since the end of World War I.[11]

23.    Many of Turner's original ideas were adopted to create the City-owned Independent ("IND") subway system, which was originally planned to be constructed in two phases.  The first phase would include trains under Sixth and Eighth Avenue; the second would be a Second Avenue subway line.

24.    Work on the IND began in the spring of 1925, when New York Mayor John Hylan first broke ground with a silver pickaxe in his hand.[12]  While the first phase resulted in the trains running under Sixth and Eighth Avenues, the onset of the Great Depression halted the second phase, and plans for the Second Avenue Subway were shelved with a plan to resume construction sometime in the future.



*Figure 2: The New York Times Front Cover August 30, 1929*

---

[10] New York City Transit Authority, *Second Avenue Subway: The Line That Almost Never Was*, NYC Subway, https://www.nycsubway.org/wiki/Second_Avenue_Subway:_The_Line_That_Almost_Never_Was (last accessed Mar. 6, 2026).

[11] Posco, *97 Years in the Making – Steel Brings a New Subway Line to NYC*, NEWSROOM (Jan. 23, 2017) https://newsroom.posco.com/en/second-avenue-subway-opens-nyc/.

[12] Greg Sargent, *The Line that Time Forgot*, NEW YORK MAG. (Mar. 26, 2004), https://nymag.com/nymetro/news/features/n_10109/.

25.    In the 1990s, plans for the Second Avenue Subway were revived as crowding on the Lexington Avenue line became too great to ignore.  To avoid disrupting the people living along the route (more than a hundred thousand per square mile) as much as possible from the dirt and noise of construction, the MTA decided to dig deep, directly from the 72nd and 86th Street stations, by using a 450-ton tunnel boring machine to drill underneath Manhattan.

26.    Finally, after nearly a century, Phase 1 of the Second Avenue Subway opened for service on January 1, 2017, with immediate improvements in service and transit access for almost 200,000 riders a day.[13]  Phase 1 extended the Q line from 63rd to 96th Street with new stations at 63rd, 72nd, 86th and 96th Streets, reducing morning overcrowding on the pre-existing Lexington Avenue lines by an average of 40%.

27.    Planning for Phase 2 began almost immediately afterward.  In November 2018, the MTA began work on extending the Q line into East Harlem up to 125th Street and building three new ADA compliant and accessible stations at 106th, 116th, and 125th Streets.  The third station, at 125th Street and Lexington Avenue, would further connect to the existing 4, 5, and 6 subway lines and the Metro-North train station.

---

[13] Stephen Nessen, *A Brief History of the Second Avenue Subway Line*, WNYC News (Dec. 16, 2016), https://www.wnyc.org/story/brief-history-2nd-avenue-subway-line/.





*Figure 3: Phase 2 Renderings of the 125 St. Subway Station*

28.    Phase 2 is expected to serve an additional 100,000 daily riders and together with Phase 1, the Second Avenue Subway alone will serve 300,000 daily riders, equivalent to the entire daily ridership of Seattle's King County Metro.[14]  The extension is also expected to have enormous benefits for the residents of East Harlem, a historically-underserved neighborhood with one of the largest concentrations of affordable housing in the United States, including by providing more than

---

[14] Joel Moreno, *King County Metro Sees Rise in Ridership and Drop in Safety Incidents, but Concerns Linger*, KOMO News (Sept. 26, 2024), https://komonews.com/news/local/metro-sees-rise-in-ridership-and-drop-in-safety-incidents-but-concerns-linger-shootings-drugs-fentanyl-assaults-attacks-fights-homeless-traffic-transit.

70,000 jobs, including union-wage construction jobs. The Environmental Assessment that was prepared for the Project in accordance with the National Environmental Policy Act for the Federal Transit Administration ("FTA") concluded that when completed, the Project would have permanent beneficial effects "relating to supporting economic growth as a result of improved transit access to East Harlem, as well as improved transit access from East Harlem to other employment centers throughout the city."[15] Community leaders also believe that the additional subway line could bring more foot traffic to the area's small businesses and boost the local economy.[16] "I think you have a lot of people that are pining for the neighborhood to be thriving and vibrant and full of positive energy," explained Carey King, the director of non-profit Uptown Grand Central.[17]

29.     Based on lessons learned from the construction during Phase 1, Phase 2 is projected to have the lowest cost per rider of any active heavy rail project in the nation.

**B.     DOT Contracts to Provide Funding for Phase 2**

30.     Phase 2 of the Second Avenue Subway is expected to cost approximately $7,699,030,840, which is to be funded through both federal and local sources: $3,404,883,991 in federal funding provided by DOT pursuant to the FFGA, with the local share calculated as $4,294,146,849 from the MTA.

31.     DOT and the MTA executed the FFGA on November 4, 2023.

32.     In agreeing to provide funding, DOT acknowledged that Phase 2 would "effectively and efficiently serve the transportation needs of the corridor on the East Side of Manhattan between

---

[15] MTA, *Supplemental Environmental Assessment to 2nd Ave Subway Final EIS: Phase 2*, (Feb. 15, 2022), https://www.mta.info/project/second-avenue-subway-phase-2/supplemental-environmental-assessment-eis.

[16] Ana Ley, *Will East Harlem Ever Get its Long-Delayed Subway?*, N.Y. Times (Jan. 31, 2022) https://www.nytimes.com/2022/01/31/nyregion/second-avenue-subway-harlem.html.

[17] *Id.*

106th Street and 125th Street," and that the cost is justified given the "mobility improvements, environmental benefits, cost effectiveness, land use, economic development effects, and congestion relief" that will result.  FFGA at 1.

33.     DOT agreed to "support final design and construction of the Project up to a Maximum Federal Section 5309 CIG Program Financial Contribution of $3,404,883,991, subject to all the terms and conditions set forth" in the FFGA.  *Id.*

34.     DOT specifically obligated $450,000,000 in CIG Grant financial assistance for the Project and committed to make further obligations.  *Id.* § 8(a); Attach. 6. On September 9, 2024, DOT executed a further award obligating an additional $496,784,764 in CIG Grant funding for the Project, bringing the total amount obligated by DOT to $946,784,764.  *See* **Exhibit 2.**

35.     In exchange, the MTA agreed to complete the Project, to provide its share of the overall Project cost, and to comply with the terms and conditions of the FFGA. FFGA at 1-2.

36.     The FFGA incorporates by reference the Federal Transit Administration Master Agreement ("FTA Master Agreement"), dated November 2, 2022.

37.     The FTA Master Agreement, in turn, incorporates OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, and DOT's implementing regulations, 2 C.F.R. Part 1201.  FTA Master Agmt. at 14.

38.     The FFGA establishes the mechanisms for payment, specifically, DOT and the MTA agreed that federal funding would be disbursed to the MTA as timely reimbursements.  The MTA would first incur costs and pay allowable project costs before requesting payments from DOT as reimbursements.  FFGA at 7; FTA Master Agmt. at 33-34.  DOT would then have 30 days to make those payments.  2 C.F.R. § 200.305(b)(3).

39.     The FTA Master Agreement further provides that for "Grants and other types of federal assistance" like the FFGA, DOT will use the "Electronic Clearinghouse Operation Web System ('ECHO-Web') to disburse all payments."  FTA Master Agmt. at 33.  The MTA agreed to comply with the "FTA ECHO-Web User Manual," April 2016, and to "withdraw federal assistance only to pay the eligible costs of implementing the Award."  *Id.*

40.     The FTA ECHO-Web User Manual describes the ECHO-Web as the "application [that] allows FTA grant recipients to request payments from their grant awards."[18]  It assures grant recipients that they can "access ECHO-WEB for payment requests 7 days a week except for system outages and the year-end closing activity period (occurring in late September/early October)" (emphasis removed).[19]

41.     Pursuant to the FTA Master Agreement, DOT may only "revoke or suspend the Recipient's ECHO Control Number and access to the ECHO-Web" in very limited circumstances.  *Id.* at 4.  Specifically, under Section 7(f)(6), the government can only shut off access to ECHO-Web if, for example, it finds that "[f]raud, waste, mismanagement, or abuse exists in the Recipient's use and application of federal assistance," which no one at DOT has ever claimed happened here.

42.     Under the regulations incorporated into the FTA Master Agreement, DOT is required to pay reimbursement requests submitted under federal grants within 30 days.  Specifically, 2 C.F.R. § 200.305(b)(3) provides:

> When the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of

---

[18] Federal Transit Administration, *Electronic Clearing House Operation (ECHO-WEB) User Guide*, U.S. Dep't of Transp. (Oct. 3, 2025), https://www.transit.dot.gov/sites/fta.dot.gov/files/2026-02/ECHO-Web-User-Guide-Version-5.1.pdf.

[19] *Id.* at 6.

the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper.

43.    The FFGA, FTA Master Agreement, and incorporated federal regulations further define how and when the federal agencies can withhold payments.

44.    Section 19 of the FFGA ("Remedies") provides that DOT may withhold funding approvals and suspend drawdowns of funds only if (1) the government provides 90 days' written notice that it believes that a breach of the Agreement has occurred and a reasonable opportunity to respond, and (2) the government subsequently makes a determination of breach and only imposes the restriction as necessary for corrective action to take place.  Neither of these conditions has been satisfied here.

45.    More specifically, in Section 19(a) the parties agreed that:

> In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, *under the provisions of Section 11 of the Master Agreement*, "Right of the Federal Government to Terminate" until any necessary corrective action, which may be required by the Government, is accomplished.

(Emphasis added.)

46.    Section 19(b) further provides:

> In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days' written notice that the Government considers that such a breach has occurred and will provide the Grantee a reasonable period of time to respond and to take necessary corrective action.

47.    Section 11 of the FTA Master Agreement, in turn, provides that DOT may suspend federal assistance under a grant award in only three specific scenarios.  Specifically, under Section 11(a):

16

> After providing written notice to the Recipient, the Recipient agrees that the Federal Government may suspend, suspend then terminate, or terminate all or any part of the federal assistance for the Award if:
>
> > (1) The Recipient has failed to make reasonable progress implementing the Award;
> >
> > (2) The Federal Government determines that continuing to provide federal assistance to support the Award does not adequately serve the purposes of the law authorizing the Award; or
> >
> > (3) The Recipient has violated the terms of the Underlying Agreement, especially if that violation would endanger substantial performance of the Underlying Agreement.

48. Finally, under 2 C.F.R. § 200.305, which, as noted above, is part of the regulations incorporated by reference, DOT may not withhold payments from the MTA unless it is required to do so by law, the MTA has failed to comply with the terms of the award, or the MTA is delinquent in a debt to the United States. Specifically:

> Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute, regulations, or in one of the following instances:
>
> > (i) The recipient or subrecipient has failed to comply with the terms and conditions of the Federal award; or
> >
> > (ii) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A-129, "Policies for Federal Credit Programs and Non–Tax Receivables." Under such conditions, the Federal agency or pass-through entity may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to the Federal Government.

2 C.F.R. § 200.305(b)(6).

49. Moreover, DOT may only withhold payments upon a determination that noncompliance cannot be remedied by imposing specific conditions. More specifically, 2 C.F.R. § 200.339 provides as follows:

The Federal agency or pass-through entity may implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award. See § 200.208 for additional information on specific conditions. When the Federal agency or pass-through entity determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency or pass-through entity may take one or more of the following actions:

(a) Temporarily withhold payments until the recipient or subrecipient takes corrective action.

(b) Disallow costs for all or part of the activity associated with the noncompliance of the recipient or subrecipient.

(c) Suspend or terminate the Federal award in part or in its entirety.

(d) Initiate suspension or debarment proceedings as authorized in 2 CFR part 180 and the Federal agency's regulations, or for pass-through entities, recommend suspension or debarment proceedings be initiated by the Federal agency.

(e) Withhold further Federal funds (new awards or continuation funding) for the project or program.

(f) Pursue other legally available remedies.

50.    Prior to imposing specific conditions, DOT must notify the grantee as to: (i) the nature of the specific condition(s); (ii) the reason why the specific condition(s) are being imposed; (iii) the nature of the action needed to remove the specific condition(s); (iv) the time allowed for completing the actions; and (v) the method for requesting the federal agency or pass-through entity to reconsider imposing a specific condition. *See id.* § 200.208(d).  Again, nothing like that has happened here.

51.    In the event that DOT withholds "[a] payment … for failure to comply with the terms and conditions of the Federal award must be released to the recipient or subrecipient upon subsequent compliance." 2 C.F.R. § 200.305(b)(7).

18

**C.    The Parties' Course of Conduct Under the FFGA**

52.    Between the beginning of the Project in 2023 and the September 30, 2025 Letter, DOT consistently paid all sums owed to the MTA under the FFGA within 30 days of the MTA's submission of a request for reimbursement through ECHO-Web, never once missing a payment or even making a late payment.

53.    The MTA submitted its first request for reimbursement under the FFGA on January 5, 2024 for $49,185,075.00.  DOT paid the reimbursement four days later on January 9, 2024.

54.    Since then, DOT has honored an additional 94 requests for reimbursement, for a total of $126,923,388.00.

55.     Although the FFGA mandates payment within 30 days of the MTA's submission of a request for reimbursement, DOT routinely paid the MTA the very next day.

56.    For example:

a.    On June 25, 2024, the MTA submitted a request for reimbursement for $2,313,509.00.  DOT paid the reimbursement on June 26, 2024.  **Exhibit 4**.

b.    On March 3, 2025, the MTA submitted a request for reimbursement for $1,193,990.00.  DOT paid the reimbursement on March 4, 2025.  *Id*.

c.    On May 15, 2025, the MTA submitted a request for reimbursement for $528,021.00.  DOT paid the reimbursement on May 16, 2025.  *Id*.

57.    Indeed, the longest the MTA ever had to wait for payment was six days over the Labor Day long weekend, when DOT paid the MTA $465,034.00 on September 3, 2025 for a reimbursement request submitted the Friday before Labor Day on August 29, 2025.

**D.    DOT's Disadvantaged Business Enterprise Program**

58.    Congress first created the DBE program in 1983 in order to require DOT to promote equal opportunity for small business owned by socially and economically disadvantaged

19

individuals.  By statute, the DBE program requires the Department to spend "not less than 10 percent" of authorized federal transportation funds on "small business concerns owned and controlled by socially and economically disadvantaged individuals."  135 Stat. 429, 449; *see* 49 C.F.R. § 26.41.

59.    Pursuant to DOT's implementing regulations, 49 C.F.R. Part 26, grant recipients are required to develop and comply with DBE participation goals for all DOT-assisted contracts. 49 C.F.R. §§ 26.41-26.55.  DOT's implementing regulations further establish DBE certification procedures, *id.* §§ 26.81-26.86, and guidelines for how grant recipients should set DBE participation goals, *id.* § 26.45.

60.    The federal regulations establish that DBE firms are certified as such at the state and local level.  Each state operates a Unified Certification Program ("UCP"), and the MTA, as a New York State UCP Partner is authorized to certify a firm's status as a DBE.

61.    A firm can apply for DBE status at a UCP through a Uniform Certification Application.  If the application is approved, that certification is binding on all DOT-assisted recipients in the state.  UCP decisions regarding certification can be appealed to DOT.  49 C.F.R. §§ 26.81-26.89.

62.    While the UCP is run at the state level, the DBE eligibility standards are uniform nationwide.  A firm must be a small business under Small Business Administration standards and within DOT's statutory size cap; be at least 51% owned and controlled by socially or economically disadvantaged individuals within the meaning of 49 C.F.R. § 26.71; and meet the personal net worth limit set by regulation.  The firm must be independent and must perform the work of its certified trade with its own employees.

63.     Prior to September 30, 2025—the same date that DOT suspended funding for the Project—DOT regulations provided that certain racial groups and women presumptively qualified as "socially and economically disadvantaged" for purposes of determining DBE ownership.  *Id.* § 26.67(a)(1) (2024).  That meant that state-operated UCPs could rely on that presumption as part of their analysis in determining whether to certify a DBE.  On September 30, 2025, however, DOT issued the DBE IFR[20], which effectively reversed its own regulations to remove race- and sex-based presumptions of disadvantage and required DBE applicants to affirmatively "demonstrate social and economic disadvantage … based on their own experiences and circumstances within American society, without regard to race or sex."  90 Fed. Reg. 47,971-72.[21]

64.     The Second Avenue Subway is subject to the DOT DBE Program.  The MTA followed the requirements set forth in 49 C.F.R. Part 26 and federal guidance in effect at the time in establishing its DBE program, including following the then-applicable methodology established by DOT for determining the overall DBE goal.

65.     In 2023, the MTA's Department of Diversity & Civil Rights ("DDCR") submitted an agency-wide goal attainment to the FTA.  The FTA and DOT did not provide any feedback or flag any problems at that time.

66.     In November 2023, the MTA's DDCR, in consultation with MTA Construction & Development, developed a DBE plan for the Project.  DDCR established DBE participation goals on a contract-specific basis.  In compliance with the requirements set forth in 49 C.F.R. Part 26, DDCR considered: (1) the potential subcontract opportunities available under each prime contract;

---

[20] DOT published the interim final rule without either publishing a proposed rule or holding a public comment period.  James Leggate, *USDOT Removes Race and Sex from DBE Qualifications With Hard-Launched Rule*, Engineering News-Record (Oct. 9, 2025), https://www.enr.com/articles/61571-usdot-removes-race-and-sex-from-dbe-qualifications-with-hard-launched-rule.

[21] *See* DOT Office of Civil Rights Guidance, *DBE IFR Guidance* (Sept. 30, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-09/DBE%20IFR%20Guidance.9-30-2025.pdf.

21

(2) the relevant availability data with respect to the scope of the contract and potential subcontracting opportunities; (3) the number and types of certified DBE firms available to perform the work; (4) the ability and availability of certified DBEs to perform on the contract; and (5) the total dollar value of the work required in relation to the dollar value of the subcontracting opportunities. *See* 49 C.F.R. § 26.45 (2024).

**E.      DOT's Suspension of Funding**

67.      On September 30, 2025, DOT notified the MTA by letter that it was initiating a review of the Second Avenue Subway DBE program.  In that same letter, DOT stated that "[t]hough the review will commence immediately, it will *temporarily* impact disbursements for the Second Avenue Subway Project.  Pending completion of the review, no further disbursements for the Project will be made." **Exhibit 3** (emphasis added).

68.      DOT did not state in this letter that it made a determination that the MTA was in breach or had failed to comply with any law or the terms of the FFGA, nor did DOT afford the MTA the contractually-required notice and opportunity to cure before suspending payment.

69.      On October 7, 2025, DOT, through its Departmental Office of Civil Rights, issued an information request to the MTA seeking comprehensive details on the MTA's DBE policies, goal-setting, procurement methodologies, and whether race, sex, ethnic, or national origin was given any consideration, preference, or credit in contracting for the Second Avenue Subway. **Exhibit 5.**  DOT also requested information regarding the certification status of firms counted toward DBE goals and the specific steps the MTA would take to ensure future procurements complied with equal protection principles, Title VI, and Executive Order 14173.  *Id.*

70.      The MTA responded on October 21, 2025 to provide the information requested and to reaffirm its commitment to "ensuring that the Project is in compliance with the Equal Protection principles of the U.S. Constitution, Federal nondiscrimination requirements under civil rights law,

including Title VI of the Civil Rights Act of 1964, and Executive Order 14173 and is in the process of updating its contract documents in that regard." **Exhibit 6.** The MTA explained that it "did not consider race or sex in the award" of Project contracts, and "did not participate in the award of any subcontracts, other than to approve the qualifications and responsibility of the firms presented by the prime contractor." *Id*. at 5. The MTA further explained that DBE contractors were certified by the New York UCP in compliance with 49 C.F.R. § 26.67, which at the time of certification had "provided for a rebuttable presumption" of disadvantage based on race and sex. *Id.* However, pursuant to DOT's IFR, the MTA indicated that it had advised its contractors that it had paused DBE participation requirements, and that all reporting should be suspended until further notice. *Id.* at 2, 5.

71.    DOT did not respond until December 1, 2025, and when it did, it admitted that it had merely conducted a review of publicly available sources, "including MTA's website," and purportedly discovered that "MTA and its prime contractors appear to have considered race and sex as part of both the prime and subcontract bidding and contract awards for the Project." **Exhibit 7.** This was a marked shift in tone from the prior communications. While DOT had previously requested information on the MTA's compliance with the new DBE requirements reflected in the DBE IFR, now DOT expressed concern for the first time about whether the MTA's DBE program complied with prior DBE rules predating the DBE IFR.

72.    DOT wrote that while it "appreciates MTA's acknowledgement that it plans to comply with the Department's DBE Interim Final Rule," it must ask the MTA to certify in writing that it has taken three principal actions as a condition to resuming funding distribution. *Id.* First, DOT instructed the MTA to "immediately cease the solicitation, collection, or use of any requirements that consider a bidder's or contractor's record of successful MWBE [Minority- and

23

Women-Owned Business Enterprises Program] or DBE usage on past or current projects." *Id.* Second, DOT instructed the MTA to "work in concert with other members of the New York Unified Certification Program to develop a comprehensive timeline for completing the required DBE reevaluation process described in 49 CFR 26.111," and provide that letter to DOT within 30 days. *Id.* Third, DOT instructed the MTA, "[t]o the extent any previously certified DBE contractor has performed or continues to perform work under a Project contract or subcontract that fails to retain its DBE certification after the UCP completes the process described in 49 CFR 26.111," to take all "necessary actions within 60 days of the completion of the reevaluation process to ensure that all such contracts and subcontracts for the Project come into compliance with 49 CFR part 26, as amended by the Department's DBE IFR." *Id.*

73.     In the letter, DOT requested a written certification from the MTA within 30 days that it accepts and will fulfill the conditions identified in the letter and stated that only then would DOT "recommence reimbursements for the Project." *Id.*

74.     Just 9 days later, the MTA responded by letter dated December 10, 2025, and certified compliance with each of DOT's three new conditions. **Exhibit 8.** The MTA wrote that it "has or is ceasing the solicitation, or use of any requirements that consider a bidder's or contractor's record of successful MWBE or DBE usage in connection with projects receiving funding," and acknowledged that all previous DBE certifications are no longer in effect. The MTA also certified that it "has been working in concert with other members of the New York [UCP] and has developed a comprehensive timeline for completing the required DBE reevaluation described in 49 CFR 26.111," and attached that timeline. *Id.* The MTA also certified that it has paused enforcement of DBE participation requirements in compliance with the DBE IFR and that it would take "all necessary actions within 60 days of the completion of the reevaluation process to ensure

24

that all projects receiving funding from DOT are in compliance with 49 CFR part 26, as amended by the [DBE IFR.]" *Id.* The MTA concluded by confirming that it remains "committed to ensuring that all its projects are administered consistent with Federal law and looks forward to DOT recommencing reimbursements for the Second Avenue Subway project." *Id.*

75. To date, the MTA has received no response to its December 10 letter.

76. Despite the fact that the September 30, 2025, October 7, 2025, and December 1, 2025 letters never identified nor even alleged any specific breach or noncompliance by the MTA, DOT stopped all payments on MTA reimbursement requests as of October 7, 2025. The last payment DOT made to the MTA was on September 25, 2025 for a reimbursement request that had been submitted on September 24, 2025. **Exhibit 4.**

77. On October 7, 2025, the MTA submitted a request for reimbursement for $634,167.00 that was never paid.[22] **Exhibit 9.** Under the heading "Processing Status," DOT's payment processing system reports that there has been "NO RESPONSE" to the MTA's request. *Id.*

78. On October 7, 2025, the MTA submitted a request for reimbursement for $36,260.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 10.**

79. On October 8, 2025, the MTA submitted a request for reimbursement for $704,707.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 11.**

80. On October 14, 2025, the MTA submitted a request for reimbursement for $617,221.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 12.**

---

[22] The ECHO-Web online portal rounds the amounts submitted for reimbursement to a whole dollar figure. Accordingly, MTA lists here the individual dollar amounts as reflected in each ECHO-Web confirmation of reimbursement request page.

81. On October 23, 2025, the MTA submitted a request for reimbursement for $7,751.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 13.**

82. On October 29, 2025, the MTA submitted a request for reimbursement for $12,939.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 14.**

83. On October 29, 2025, the MTA submitted a request for reimbursement for $58,607.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 15.**

84. On October 30, 2025, the MTA submitted a request for reimbursement for $12,919.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 16.**

85. On November 3, 2025, the MTA submitted a request for reimbursement for $1,085.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 17.**

86. On November 5, 2025, the MTA submitted a request for reimbursement for $20,243.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 18.**

87. On November 7, 2025, the MTA submitted a request for reimbursement for $11,741,217.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 19.**

88. On November 7, 2025, the MTA submitted a request for reimbursement for $16,646,435.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 20.**

89. On November 10, 2025, the MTA submitted a request for reimbursement for $38,093.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 21.**

90. On November 12, 2025, the MTA submitted a request for reimbursement for $913,893.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 22.**

91. On November 17, 2025, the MTA submitted a request for reimbursement for $257,114.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 23.**

92. On November 19, 2025, the MTA submitted a request for reimbursement for $80,759.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 24.**

93. On November 20, 2025, the MTA submitted a request for reimbursement for $1,423.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 25.**

94. On November 21, 2025, the MTA submitted a request for reimbursement for $1,453,856.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 26.**

95. On November 26, 2025, the MTA submitted a request for reimbursement for $7,816,377.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 27.**

96. On December 1, 2025, the MTA submitted a request for reimbursement for $13,436.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 28.**

97. On December 3, 2025, the MTA submitted a request for reimbursement for $2,004,726.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 29.**

98. On December 4, 2025, the MTA submitted a request for reimbursement for $23,440.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 30.**

99. On December 8, 2025, the MTA submitted a request for reimbursement for $1,151,988.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 31.**

100. On December 10, 2025, the MTA submitted a request for reimbursement for $4,105.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 32.**

101. On December 16, 2025, the MTA submitted a request for reimbursement for $6,530.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 33.**

102. On December 22, 2025, the MTA submitted a request for reimbursement for $13,436.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 34.**

103. On December 24, 2025, the MTA submitted a request for reimbursement for $784,755.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 35.**

104. On December 30, 2025, the MTA submitted a request for reimbursement for $1,231.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 36.**

105. On January 7, 2026, the MTA submitted a request for reimbursement for $799,132.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 37.**

106. On January 12, 2026, the MTA submitted a request for reimbursement for $530.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 38.**

107. On January 12, 2026, the MTA submitted a request for reimbursement for $88,672.00 that was never paid and has been labeled "NO RESPONSE."  **Exhibit 39.**

108. On January 15, 2026, the MTA submitted a request for reimbursement for $403,125.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 40.**

109. On January 20, 2026, the MTA submitted a request for reimbursement for $992.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 41.**

110. On January 27, 2026, the MTA submitted a request for reimbursement for $6,482,677.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 42.**

111. On January 28, 2026, the MTA submitted a request for reimbursement for $13,436.00 that was never paid and has been labeled "NO RESPONSE." **Exhibit 43.**

112. In total, the MTA has submitted reimbursement requests for $52,847,178.00 that have not been paid and are due.

113. On October 28, 2025, DOT instructed the MTA to cease submitting reimbursement requests through DOT's payment processing system.  When the MTA continued to submit reimbursement requests, DOT disabled the MTA's access to the system, thereby preventing the

28

MTA from submitting further invoices. Thus, but for DOT's unlawful actions, the MTA would have submitted the following requests for reimbursement through DOT's payment processing system:

    a.  A reimbursement request for $97,432.65 on February 6, 2026;

    b.  A reimbursement request for $2,147,897.83 on February 9, 2026; and

    c.  A reimbursement request for $3,550,830.62 on February 10, 2026.

114.    DOT's refusal to pay these reimbursement requests, totaling $5,796,161.10, lacks any contractual basis because the MTA is not in breach, default, or noncompliance with the FFGA, FTA Master Agreement, or incorporated federal regulations. DOT has also not notified the MTA that it has made a determination that MTA breached, defaulted, or failed to comply with the FFGA or FTA Master Agreement, and DOT has not provided the MTA with any opportunity to cure any alleged breach, default, or noncompliance.

115.    What's more, the MTA was in full compliance with the DBE rules in effect prior to the IFR. Following the DBE IFR, the MTA was responsive and communicative, agreeing to support DOT's review and revise its DBE program and subcontracts to ensure full compliance with the DBE IFR and updated DOT guidance.

## F.    DOT's Shifting Explanations

116.    Even as DOT purported to suspend payments pending its "review" of the Project, President Trump and other administration officials were making it clear that DOT's failure to pay was not really about compliance issues at all.

117.    On October 1, 2025, the day after DOT sent its letter suspending payments, the federal government shut down. Not surprisingly, the current Republican administration blamed Democratic Congressional leaders. Senior Executive Branch officials publicly threatened to halt

and terminate funding to New York state as retribution for positions taken by New York Democrats during shutdown negotiations.

118.    On October 1, 2025, the OMB Director Russell Vought specifically articulated that the Second Avenue Subway would be targeted for this political retribution, announcing on X that "[r]oughly $18 billion in New York City infrastructure projects have been put on hold to ensure funding is not flowing based on unconstitutional DEI principles. More info to come soon from @USDOT."



*Figure 4: Russ Vought's Post on X on October 1, 2025*

119.    That same day, DOT issued a statement announcing that the Second Avenue Subway was under administrative review and that, "[t]hanks to the Chuck Schumer and Hakeem Jeffries shutdown, however, USDOT's review of New York's unconstitutional practices will take more time…. This is another unfortunate casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal immigrants benefits."[23]

*Figure 5: DOT's October 1 Press Statement*

---

[23] U.S. Dep't of Transp., *U.S. Department of Transportation Statement on Review of New York's Discriminatory, Unconstitutional Contracting Process*, (Oct. 1, 2025) https://www.transportation.gov/briefing-room/us-department-transportation-statement-review-new-yorks-discriminatory.

120.    And from the Oval Office, President Trump remarked, "[w]e can get rid of a lot of things we didn't want… They would be Democrat things."[24]

121.    The very next day, President Trump shared his plans to meet with OMB Director Russell Vought and determine what cuts he would make because of "Radical Left Democrats," by posting the following message on Truth Social:



*Figure 6: President Trump's Post on October 2, 2025*

122.    In a press conference on October 15, 2025, President Trump further pronounced that "we're getting rid of a lot of things that we never wanted because of the fact that [the Democrats] made this stupid move … Russell Vought is really terminating tremendous numbers of Democrat projects."[25]

123.    These statements leave no doubt that DOT has never determined the MTA to be in breach of any of its obligations or the law, but rather used funding for the Project to punish Democrats in Congress.

---

[24] Valerie Yurk, *Blaming shutdown, DOT Freezes Funds for Projects in New York*, RollCall (Oct. 1, 2025), https://rollcall.com/2025/10/01/blaming-shutdown-dot-freezes-funds-for-projects-in-new-york/.

[25] The White House, *President Trump Participates in a Press Conference with the Director of the FBI*, at 39:42–57 (YouTube, Oct. 15, 2025), https://www.youtube.com/watch?v=f1M57bKXlKU&t=2806s.

**G.      Impact of Loss of Funding**

124.      Without the promised funding from DOT, the MTA has been placed in the impossible position of having to divert critical transportation infrastructure funding from other priorities.  This is unsustainable and the steady progress on Phase 2 will eventually have to come to a screeching halt.

125.      The Project is planned to be built under four successive contracts.  In August 2025, the MTA announced that it had approved the second of four contracts ("C-2").  Under this $1.972 billion contract, construction crews will excavate space for the future 125 Street Station and a 750-ton boring machine is set to drill the new tunnel from 116th Street to 125th Street and west to the Lexington Avenue line.  Early work has already begun, and heavy civil construction is intended to begin this year.

126.      The MTA is contributing its share of the total funding for Phase 2 of the Second Avenue Subway from its 2015-2019 and 2020-2024 Capital Plans, which also have other critical needs.

127.      Those needs include:  (1) replacing over 1,500 aging subway cars and purchasing an additional 437 new subway cars to increase the size of the fleet;  (2) replacing over 2,200 older buses and increasing the fleet by 186 new buses; (3) making 70 subway stations ADA accessible such that by 2026, over 50% of stations will be fully accessible to all New Yorkers; and (4) increasing the size of the LIRR electric fleet by 160 cars.[26]

---

[26] MTA Capital Program, *MTA Capital Program 2020-2024 Executive Summary*, https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf.

128.    The MTA Capital Plans also commit funding to repair and upgrade police facilities, fire safety systems, and tunnel lighting, modernize signals on six lines, and renew power equipment across the entire subway system.

129.    These Capital Plan projects are expected to generate at least $75 billion in statewide economic activity and 350,000 new jobs.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF THE FULL FUNDING GRANT AGREEMENT
### *Failure to Pay Reimbursement Requests Submitted Through the ECHO-Web System*

130.    The MTA realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

131.    To state a claim for breach of contract, a Plaintiff must show "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by that breach." *Claude Mayo Constr. Co., Inc. v. United States*, 132 Fed. Cl. 634, 637 (2017).

132.    The FFGA, its Amendment, and the incorporated FTA Master Agreement constitute a valid contract between DOT and the MTA entered into by a DOT official with authority to bind the United States.

133.    Pursuant to the terms of the FFGA, DOT agreed "to support final design and construction of the Project up to a Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution of $3,404,883,991." FFGA at 1.

134.    Further, DOT obligated $450,000,000 in Section 5309 Capital Investment Grants Program financial assistance for the Project. FFGA at 8.

34

135.    On September 9, 2024, DOT obligated an additional $496,784,764 in CIG Grant funding for the Project, bringing the total amount obligated by DOT to $946,784,764. *See* Exhibit 2.

136.    In the event of a breach of the FFGA by the MTA, the Government must provide the MTA with "ninety (90) days written notice that the Government considers that such a breach has occurred" and "a reasonable period of time to respond and to take necessary corrective action" *before* the Government may terminate or suspend the Agreement.  FFGA at 12-13.

137.    Under the FFGA, the Government agreed that when its "approval or concurrence is needed on any matter," it "will not be unreasonably withheld."  FFGA at 12.

138.    The FFGA incorporates by reference the terms of the Federal Transit Administration Master Agreement dated November 2, 2022.  FFGA at I, 13.

139.    Under the FTA Master Agreement, DOT agreed to "apply to the Award" the requirements of 2 C.F.R. Part 200.  FTA Master Agmt. § 3(f)(1).

140.    2 C.F.R. § 200.305(b)(3) provides that DOT "*must* make payment within 30 calendar days after receipt of the payment request." (emphasis added)

141.    Similarly, § 200.305(b)(6) provides that "[p]ayments for allowable costs *must not be withheld at any time* during the period of performance" absent certain conditions, none of which are present here.

142.    There is no contractual basis for DOT to assert that the MTA's reimbursement requests are improper and DOT has never indicated otherwise, either through a formal notice or any other means.

143.    There is no contractual basis for DOT to withhold payment from the MTA under 2 C.F.R. § 200.305.

144.    Withholding payment from the MTA is not required by Federal statute or regulation.

145.    The MTA has complied with the terms and conditions of the FFGA.

146.    The MTA is not delinquent or in debt to the United States.

147.    The MTA has made reasonable progress in advancing the Second Avenue Subway consistent with the goals of the Project, the FFGA, and the statutory and regulatory authority underlying the FFGA.

148.    The MTA has performed its obligations under the FFGA in compliance with applicable law and the terms of the FFGA and DOT has never indicated otherwise, either through a formal notice or any other means.

149.    The MTA has timely submitted requests for reimbursement that have not been paid by DOT, in breach of the FFGA and incorporated terms of the FTA Master Agreement.

150.    The MTA has submitted the following requests for reimbursement as required under the FFGA, none of which have been paid:

| Date | Amount Submitted |
| --- | --- |
| 10/7/2025 | $634,167.00 |
| 10/7/2025 | $36,260.00 |
| 10/8/2025 | $704,707.00 |
| 10/14/2025 | $617,221.00 |
| 10/23/2025 | $7,751.00 |
| 10/29/2025 | $12,939.00 |
| 10/29/2025 | $58,607.00 |
| 10/30/2025 | $12,919.00 |
| 11/3/2025 | $1,085.00 |
| 11/5/2025 | $20,243.00 |
| 11/7/2025 | $11,741,217.00 |
| 11/7/2025 | $16,646,435.00 |
| 11/10/2025 | $38,093.00 |
| 11/12/2025 | $913,893.00 |
| 11/17/2025 | $257,114.00 |

| Date | Amount Submitted |
|---|---|
| 11/19/2025 | $80,759.00 |
| 11/20/2025 | $1,423.00 |
| 11/21/2025 | $1,453,856.00 |
| 11/26/2025 | $7,816,377.00 |
| 12/1/2025 | $13,436.00 |
| 12/3/2025 | $2,004,726.00 |
| 12/4/2025 | $23,440.00 |
| 12/8/2025 | $1,151,988.00 |
| 12/10/2025 | $4,105.00 |
| 12/16/2025 | $6,530.00 |
| 12/22/2025 | $13,436.00 |
| 12/24/2025 | $784,755.00 |
| 12/30/2025 | $1,231.00 |
| 1/7/2026 | $799,132.00 |
| 1/12/2026 | $530.00 |
| 1/12/2026 | $88,672.00 |
| 1/15/2026 | $403,125.00 |
| 1/20/2026 | $992.00 |
| 1/27/2026 | $6,482,677.00 |
| 1/28/2026 | $13,436.00 |
| **TOTAL** | **$52,847,178.00** |

151. In total, DOT has failed to honor $52,847,178.00 in reimbursement requests.

152. Each of these reimbursement requests is for eligible expenses for the Project under the FFGA, and DOT has never suggested otherwise.

153. DOT has therefore breached the FFGA, by failing to comply with the prompt payment requirements of 2 C.F.R. § 200.305(b)(3), which are incorporated into the Agreement via the FTA Master Agreement and applicable regulations.

154. DOT further breached the FFGA by suspending payments during the period of performance, in violation of § 200.305(b)(6) which is incorporated into the Agreement via the FTA Master Agreement and applicable regulations.

37

155.    DOT also breached the FFGA by suspending the MTA's ability to submit reimbursement requests online, as required by the FTA Master Agreement.  FTA Master Agmt. § 7(e)(1).

156.    DOT has not provided MTA with any notice that the Government believes the MTA is in breach of the FFGA, and has not provided any time "to respond and to take necessary corrective action."  Instead, the Government has unilaterally suspended payment, in violation of the plain requirements of the FFGA.  FFGA at 12-13.

157.    DOT's breach of the FFGA and applicable payment terms has caused the MTA to suffer damages in the amount of the improperly withheld payments, or $52,847,178.00.

158.    On information and belief, DOT will continue its unlawful funding suspension and breach of the FFGA for the foreseeable future—at least absent judicial correction.  MTA reserves the right to supplement this pleading to bring additional claims for damages if necessary.

## COUNT II
## BREACH OF THE FULL FUNDING GRANT AGREEMENT
### *Failure to Pay Remaining Outstanding Reimbursements*

159.    The MTA realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

160.    It is a well-recognized and long-standing principle of contract law that "where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party cannot in any way take advantage of that failure." *Park Props. Assocs., L.P. v. United States*, 82 Fed. Cl. 162, 171 (2008).

161.    The FFGA constitutes a valid contract between DOT and the MTA entered into by a DOT official with authority to bind the United States.

38

162.    Pursuant to the terms of the FFGA, DOT agreed "to support final design and construction of the Project up to a Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution of $3,404,883,991."  FFGA at 1.

163.    DOT obligated $450,000,000 in Section 5309 Capital Investment Grants Program financial assistance for the Project.  FFGA at 8.  On September 9, 2024, DOT obligated an additional $496,784,764 in CIG Grant funding for the Project, bringing the total amount obligated by DOT to $946,784,764.  *See* Exhibit 2.

164.    In the event of a breach of the FFGA by the MTA, the Government must provide the MTA with "ninety (90) days written notice that the Government considers that such a breach has occurred" and "a reasonable period of time to respond and to take necessary corrective action" *before* the Government may terminate or suspend the Agreement.  FFGA at 12-13.

165.    Under the FFGA, the Government agreed that when its "approval or concurrence is needed on any matter," it "will not be unreasonably withheld."  FFGA at 12.

166.    The FFGA incorporates by reference the terms of the Federal Transit Administration Master Agreement dated November 2, 2022.  FFGA at I, 13.

167.    Under the FTA Master Agreement, DOT agreed to "apply to the Award" the requirements of 2 C.F.R. Part 200. Master Agmt. § 3(f)(1).

168.    2 C.F.R. § 200.305(b)(3) provides that DOT "*must* make payment within 30 calendar days after receipt of the payment request." (emphasis added)

169.    Similarly, § 200.305(b)(6) provides that "[p]ayments for allowable costs *must not be withheld at any time* during the period of performance" absent certain conditions, none of which are present here.

39

170. There is no contractual basis for DOT to assert that the MTA's reimbursement requests are improper and DOT has never indicated otherwise, either through a formal notice or any other means.

171. There is no contractual basis for DOT to withhold payment from the MTA under 2 C.F.R. § 200.305.

172. Withholding payment from the MTA is not required by Federal statute or regulation.

173. The MTA has complied with the terms and conditions of the FFGA.

174. Indeed, the MTA has complied with all requests for information and certifications related to Executive Order 14173.

175. The MTA is not delinquent or in debt to the United States.

176. The MTA has made reasonable progress in advancing the Second Avenue Subway consistent with the goals of the project, the FFGA, and the statutory and regulatory authority underlying the FFGA.

177. The MTA has complied with the terms and conditions of the FFGA.

178. The MTA has timely submitted requests for reimbursement that have not been paid by DOT, in breach of the FFGA and incorporated terms of the FTA Master Agreement.

179. On October 28, 2025, a DOT employee instructed the MTA to cease submitting reimbursement requests through DOT's payment processing system.

180. When the MTA continued to submit reimbursement requests, DOT disabled the MTA's access to the system, thereby preventing the MTA from submitting further invoices. Under the FTA Master Agreement, MTA agreed to accept payments through ECHO-Web and comply

with the "FTA ECHO-Web User Manual," which further provides that the ECHO-Web application can be accessed "7 days a week."[27]

181. But for DOT's unlawful actions, the MTA would have submitted the following requests for reimbursement through DOT's payment processing system:

| Date | Amount Submitted |
|---|---|
| 2/6/2026 | $97,432.65 |
| 2/9/2026 | $2,147,897.83 |
| 2/10/2026 | $3,550,830.62 |
| **TOTAL** | **$5,796,161.10** |

182. Each of these reimbursement requests would have been for eligible expenses for the Project under the FFGA, and DOT has never suggested otherwise.

183. On information and belief, DOT will continue its unlawful funding suspension and breach of the FFGA for the foreseeable future—at least absent judicial correction. The MTA reserves the right to supplement this pleading to bring additional claims for damages if necessary.

**COUNT III**
**BREACH OF THE FULL FUNDING GRANT AGREEMENT**
*Breach of the Duty of Good Faith and Fair Dealing*

184. The MTA realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

185. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). The implied duty of good faith and fair dealing "includes

---

[27] Federal Transit Administration, *Electronic Clearing House Operation (ECHO-WEB) User Guide*, U.S. Dep't of Transp. (Oct. 3, 2025), https://www.transit.dot.gov/sites/fta.dot.gov/files/2026-02/ECHO-Web-User-Guide-Version-5.1.pdf.

'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

186. The FFGA is a valid contract between DOT and the MTA, entered into by DOT officials with the authority to bind the United States.

187. The FFGA contains provisions by which DOT agreed to reimburse the MTA for eligible expenses incurred for the Second Avenue Subway.

188. The MTA entered into the FFGA with DOT with the reasonable expectation that DOT would comply with the terms of the FFGA, the FTA Master Agreement, and regulations incorporated by reference.

189. The MTA also entered into the FFGA with the reasonable expectation that DOT would act in good faith and deal fairly with the MTA by reimbursing the MTA for eligible expenses on a timely basis to ensure the continued and timely performance of the FFGA.

190. DOT breached the FFGA's implied duty of good faith and fair dealing.

191. DOT breached this implied duty by targeting the FFGA for improper withholding payments for irrelevant (and inconsistent) reasons.

192. DOT officials claimed the withholding was in retribution for the perceived role of New York politicians in a federal government shutdown.

193. DOT officials also claimed the funds were withheld for alleged but not finalized conclusions that the MTA's contracting practices violated Executive Order 14173.

194. OMB officials claim that review of the MTA's relevant certifications would be "delayed" due to the shutdown.

195.    DOT has also breached this implied duty by failing to honor its own commitment to resume reimbursements "upon certification by the MTA that it will take [specified] actions to ensure Federal funds do not flow to uses that are inconsistent with Equal Protection principles," Dec. 1, 2025 Ltr. from A. Williams to J. Lieber, despite the MTA providing the requested certification on December 10, 2025. Dec. 10, 2025 Ltr. from J. Lieber to A. Williams.

196.    DOT's actions interfered with the MTA's ability to rely on federal funding for the timely completion of the Second Avenue Subway and destroyed the MTA's reasonable expectations regarding the fruits of the Agreement.

197.    Upon information and belief, DOT's withholding of payments from the MTA under the FFGA and disabling the MTA's ability to submit reimbursement requests online, in violation of the FTA Master Agreement, is intended to interfere with the MTA's performance of the Project based on political considerations despite lacking any authority to do so under the terms of the FFGA.

198.    In addition to the $52,847,178.00 in withheld payments, DOT's actions caused the MTA to suffer damages in an amount to be determined at trial.

199.    On information and belief, DOT will continue its unlawful funding suspension and breach of its implied duty of good faith and fair dealing for the foreseeable future—at least absent judicial correction.  The MTA reserves the right to supplement this pleading to bring additional claims for damages if necessary.

**<u>COUNT IV</u>**
**BREACH OF THE FULL FUNDING GRANT AGREEMENT**
*Consequential Damages Resulting from Breach*

200.    The MTA realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

43

201.    As a result of Defendant's breach of the FFGA, the MTA has suffered damages beyond the specific withheld funds.  Specifically, the delayed reimbursements have caused the MTA to delay finalizing procurement agreements, divert funds from other projects, and incur additional expenses.

202.    Where a party breaches a contract, additional damages are available where "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Spectrum Scis. & Software, Inc. v. United States*, 98 Fed. Cl. 8, 13 (2011).

203.    To demonstrate foreseeability, all that is required is "merely that the injury actually suffered" be "of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (citations omitted).

204.    The MTA's continuing consequential damages, caused by DOT's breach, were reasonably foreseeable as delayed reimbursement necessarily impacts the MTA's ability to procure services in a timely and cost-efficient manner and manage its financial obligations.

205.    These damages "would not have occurred but for the breach." *Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed.Cir.2008).

206.    Indeed, if DOT had not improperly withheld payments, the MTA could have avoided these damages.

207.    These damages can be calculated with reasonable certainty with evidence to be presented in trial.  At this stage, "where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001).

44

208.    DOT's breach of the FFGA, and applicable payment terms has caused the MTA to suffer damages in an amount in excess of the withheld payments, which will be determined at trial.

209.    On information and belief, DOT will continue its unlawful funding suspension and breach of its contractual obligations to pay for the foreseeable future—at least absent judicial correction.  The MTA thus reserves the right to supplement this pleading to bring additional claims for damages if necessary.

## PRAYER FOR RELIEF

WHEREFORE, the MTA requests that the Court enter judgment against the United States as follows:

i.      Awarding money damages to the MTA in the amount of $58,643,339.10 for DOT's failure to make required payments and disbursements under the SAS2 Agreement due on or before March 17, 2026;

ii.     Awarding additional money damages to the MTA for DOT's improper suspension of funding under the SAS2 Agreement for any costs of the resulting work suspension in an amount to be determined at trial;

iii.    Awarding consequential damages to the MTA in an amount to be determined at trial for DOT's failure to make timely required payments and disbursements under the SAS2 Agreement;

iv.     Awarding any allowable pre- and post-judgment interest and costs allowed by law; and

v.      Grant all such other and further relief as the Court deems just and proper.

45

Dated: March 17, 2026
      New York, New York

Respectfully submitted,

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*Attorneys for Plaintiff*