**UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>     *Plaintiff*,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>     *Defendant*. | Case No. 26 Civ. 422<br><br>Hon. Philip S. Hadji |

**PLAINTIFF'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT (COUNTS I – III)</u>**

Plaintiff the Metropolitan Transportation Authority, by its undersigned attorneys, and upon the accompanying Memorandum of Law in Support of Plaintiff's Partial Motion for Summary Judgment on Counts I – III, dated March 20, 2026; the Declaration of Jaibala Patel, dated March 20, 2026, with exhibits; the Declaration of D. Brandon Trice, dated March 20, 2026; and all other papers and proceedings in this matter; hereby moves before the Honorable Philip S. Hadji, United States Court of Federal Claims, 717 Madison Place, NW, Washington, D.C. 20439, for an order, pursuant to Rules 56(a) and 54(b) of the Rules of the United States Court of Federal Claims, granting Plaintiff summary judgment on Counts I – III and entering final judgment for Plaintiff in the amount of $58,643,438.10, and for such other relief as this Court may deem just and proper.

Plaintiff requests oral argument on this motion.

Dated: March 20, 2026
   New York, New York

Respectfully submitted,

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com


*Attorneys for Plaintiff*

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>　　　　　　　　　*Plaintiff*,<br><br>　　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　　　　*Defendant*. | Case No. 26 Civ. 422<br><br>Hon. Philip S. Hadji |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (COUNTS I – III)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................... 1

QUESTIONS PRESENTED................................................................................................. 2

STATEMENT OF THE CASE............................................................................................. 2

    A.    Second Avenue Subway Phase 2 Is a Critical Infrastructure Project............................. 2

    B.    The FFGA and Governing Regulations Impose Strict Payment Terms on DOT............ 5

    C.    The MTA's Disadvantaged Business Enterprise Program ............................................... 7

    D.    DOT Suspends Reimbursements in Clear Violation of Its Obligations........................... 8

    E.    DOT's Administrative Review of the Project .................................................................. 9

    F.    DOT Unlawfully Refuses to Pay More than $58 Million in Obligated Federal
        Assistance ...................................................................................................................... 12

    G.    President Trump and DOT Officials Explicitly Describe the Suspension as
        Politically Motivated..................................................................................................... 14

LEGAL STANDARD.......................................................................................................... 16

ARGUMENT....................................................................................................................... 17

I.    DOT Breached the SAS2 Agreement By Improperly Withholding $58,643,438.10 in
    Reimbursements.............................................................................................................. 17

    A.    DOT Was Obligated to Honor Reimbursement Requests Within 30 Days of Each
        Request.......................................................................................................................... 18

    B.    DOT Cannot Rely on Its Ongoing "Review" to Justify Its Breaches ........................... 19

    C.    DOT Improperly Prevented the MTA from Seeking Reimbursement of
        $5,796,161.10................................................................................................................ 20

D.    DOT Owes $58,643,438.10 in Damages ....................................................................... 21

II.    The Court Should Enter Partial Final Judgment for the MTA in the Amount of
       $58,643,438.10................................................................................................................ 22

CONCLUSION........................................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013).................................................................................................. 15

*Bank of Advance v. United States*,
   6 Cl. Ct. 535 (1984) ................................................................................................. 21

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
   2016 WL 4445770 (C.D. Cal. Aug. 12, 2016) ..................................................... 2, 15

*Clinchfield Coal Co. v. United States*,
   105 Fed. Cl. 134 (2012) ............................................................................................ 16

*Conn. Yankee Atomic Power Co. v. United States*,
   142 Fed. Cl. 87 (2019) ......................................................................................... 17, 23

*Energy Nw. v. United States*,
   69 Fed. Cl. 500 (2006) .............................................................................................. 17

*Gateway Dev. Comm'n v. United States*,
   __ Fed. Cl. __, 2026 WL 730764 (Mar. 12, 2026)........................................ 1, 5, 18, 19, 20, 23

*Gilead Scis., Inc. v. United States*,
   169 Fed. Cl. 210 (2024) ............................................................................................ 17

*Loc. Initiative Health Auth. for L.A. Cnty. v. United States*,
   145 Fed. Cl. 746 (2019) ............................................................................................ 23

*Metro. Transp. Auth. v. Duffy*,
   784 F. Supp. 3d 624 (S.D.N.Y. 2025) ........................................................................ 2

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
   530 U.S. 604 (2000).................................................................................................. 17

*Northstar Vermont Yankee, LLC v. United States*,
   159 Fed. Cl. 575 (2022) ............................................................................................ 17

*Novartis Corp. v. Ben Venue Lab'ys*,
   271 F.3d 1043 (Fed. Cir. 2001) ................................................................................. 17

*NVT Techs., Inc. v. United States*,
   370 F.3d 1153 (Fed. Cir. 2004) ................................................................................. 17

*Park Props. Assocs., L.P. v. United States*,
    82 Fed. Cl. 162 (2008) ........................................................................................ 21

*Premier Off. Complex of Parma, LLC v. United States*,
    916 F.3d 1006 (Fed. Cir. 2019) .......................................................................... 17

*San Carlos Irrigation & Drainage Dist. v. United States*,
    877 F.2d 957 (Fed. Cir. 1989) ...................................................................... 17, 21

*Sweats Fashions, Inc. v. Pannill Knitting Co.*,
    833 F.2d 1560 (Fed. Cir. 1987) .......................................................................... 16

**STATUTES**

28 U.S.C. § 2516(a) .................................................................................................. 23

Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat. 429, 449 ............. 7

**RULES**

RCFC 54(b).............................................................................................. 2, 17, 22

RCFC 56(a).................................................................................................. 2, 16

**REGULATIONS**

2 C.F.R. § 200 ................................................................................... 5, 6, 18, 20

49 C.F.R. § 26 ...............................................................................................7, 9, 11

90 Fed. Reg. 47 .................................................................................................... 8

**OTHER AUTHORITIES**

Chris Marquette & Ry Rivard, *Massive NY Tunnel and Subway Projects Still Alive, Official Says Despite Trump's Claims*, POLITICO (Oct. 16, 2025),
    https://www.politico.com/news/2025/10/16/gateway-and-second-ave-subway-projects
    -still-alive-despite-trump-comments-00611371...................................................... 14

Chris Marquette, *'We're Not Trying to Shut Down These Projects,' Duffy Insists About NY Tunnels*, E&E News (Oct. 7, 2025), https://www.eenews.net/articles/were-not-trying-to-shut-
    down-these-projects-duffy-insists-about-ny-tunnels/ ................................................. 3

DOT Office of Civil Rights Guidance, *DBE IFR Guidance* (Sept. 30, 2025),
https://www.transportation.gov/sites/dot.gov/files/2025-09/DBE%20IFR%20
Guidance.9-30-2025.pdf ................................................................................................ 8

DOT, *U.S. Dep't of Transp. Statement on Review of New York's Discriminatory, Unconstitutional
Contracting Processes* (Oct. 1, 2025), https://www.transportation.gov/briefing-room/us-
department-transportation-statement-review-new-yorks-discriminatory ................................. 15

E. Allan Farnsworth, Farnsworth on Contracts § 8:6 (2d ed. 1998) ............................................ 21

Executive Order 14173, *Ending Illegal Discrimination and Restoring
Merit-Based Opportunit*y. ......................................................................................... 9

GAO, A Glossary of Terms Used in the Federal Budget Process 70 (GAO–05–734SP, 2005) ...... 4

The White House, *President Trump Participates in a Press Conference with the Director of the
FBI*, at 39:42–57 (YouTube, Oct. 15, 2025),
https://www.youtube.com/watch?v=f1M57bKXlKU&t=2806s ................................................ 15

United States of America Department of Transportation Federal Transit Administration, *Master
Agreement* (November 2, 2022), https://www.transit.dot.gov/sites/fta.dot.gov
/files/2022-11/FTA-Master-Agreement-v30-2022-11-02_0.pdf ....................................... *passim*

*USDOT Removes Race and Sex from DBE Qualifications With Hard-Launched Rule*,
ENGINEERING NEWS-RECORD (Oct. 9, 2025), https://www.enr.com/articles/61571
-usdot-removes-race-and-sex-from-dbe-qualifications-with-hard-launched-rule ...................... 8

Plaintiff the Metropolitan Transportation Authority ("MTA") respectfully submits this memorandum of law in support of its motion for an order granting partial summary judgment on Counts I through III of its Complaint (ECF 1) and final judgment in the amount of $58,643,438.10.

**PRELIMINARY STATEMENT**

In November 2023, the MTA and U.S. Department of Transportation ("DOT") entered into a contract to deliver on a century-old promise to the residents and commuters of East Harlem: extending the Second Avenue Subway from 96th Street to 125th Street. This ambitious infrastructure project, Second Avenue Subway Phase 2 ("SAS2" or "the Project"), will bring new subway access to a "transit desert," create three new subway stations, shorten commutes for more than 100,000 daily riders, and deliver new transit capacity at the lowest cost per rider of any heavy rail project in America. DOT agreed to fund nearly half of the estimated net project cost, with the MTA funding the remainder.

Initially, DOT delivered on its promise, honoring the MTA's requests for reimbursement within 30 days as required under the governing Full Funding Grant Agreement. But on September 30, 2025, DOT abruptly changed course and began to withhold further funding purportedly based on a vague, apparently indefinite "review" of the MTA's Disadvantaged Business Enterprise ("DBE") program, despite the fact that the MTA has not only provided all the information requested, but also provided the certifications requested by DOT. Five months later, that "review" remains ongoing, and the MTA has already been deprived of $58 million in promised funding.

DOT's actions are clearly unlawful. Just last week, this Court recognized in a substantially similar case that DOT's suspension of funding "did not adhere to the plain and clear requirements of the contracts and regulations," which "set out a specific process DOT must follow *before* it suspends disbursements." *Gateway Development Commission v. United States*, __ Fed. Cl. __, 2026 WL 730764, at *14 (Mar. 12, 2026) (Hertling, J.) ("*GDC*") (emphasis in original). The same

holds true here, and this Court can and should quickly resolve the MTA's claims for breach arising from DOT's failure to reimburse $58,643,438.10.

As Judge Lewis Liman of the Southern District of New York recently explained in connection with litigation over the MTA's congestion pricing program: "[i]t is so obvious that it almost need not be stated that when money is obligated and is not paid as promised, harm follows—debt is incurred, debt is unpaid, and budgets are upended." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 691 (S.D.N.Y. 2025) (cleaned up). That is exactly what is happening here. If funding is not resumed and soon, there is a serious risk of a "domino effect" of cascading delays and inflated costs. *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, 2016 WL 4445770, at *11 (C.D. Cal. Aug. 12, 2016). After more than 100 years of waiting by the residents of East Harlem, it is now time for this vital project to move forward to completion, and for the Government to be held to its word.

## QUESTIONS PRESENTED

1.     Whether the Court should grant summary judgment, pursuant to RCFC 56(a), to the MTA on Counts I – III of the Complaint, which allege DOT has breached the governing agreement and regulations by failing to make disbursements to the MTA within 30 days of each reimbursement request.

2.     Whether the Court should grant final judgment, pursuant to RCFC 54(b), to the MTA on Counts I – III of the Complaint and award damages in the amount of $58,643,438.10.

## STATEMENT OF THE CASE

### A.     Second Avenue Subway Phase 2 Is a Critical Infrastructure Project.

The Second Avenue Subway Project is the fulfillment of a longstanding promise to the residents of east Manhattan and Harlem. In Phase 1, the MTA extended the Q subway line from 63rd to 96th Street, building additional stations at 63rd, 72nd, 86th, and 96th Streets, thereby

2

expanding transit access to nearly 200,000 riders each day on the Upper East Side. *See* Decl. of Jaibala Patel in Supp. of Pl.'s Mot. for Summ. J. on Counts I – III ("Patel Decl.") ¶ 2. Phase 2, which is the subject of this lawsuit, builds on Phase 1 by extending the Q line into East Harlem, adding two new stations at 106th and 116th Streets, and a third station at 125th that will connect to the 4, 5, and 6 subway lines and the Metro-North train station that connects Manhattan to the rest of New York and the tri-state area. *Id.* ¶ 3. Phase 2 will service an additional 110,000 daily riders beyond those already serviced by Phase 1 and lead to more than 70,000 new jobs, including union-wage construction jobs. *Id.* ¶ 4. Phase 2 will also finally bring modern transit access to East Harlem, which is one of New York's most transit-reliant neighborhoods, with 71 percent of its residents using public transportation to get to work (compared to a NYC-wide average of 56 percent). *Id.*

Recognizing the importance of all this, in November 2023, DOT entered into a Full Funding Grant Agreement with the MTA (the "FFGA" or "Agreement"). *See* Exs. 1-2.[1] In agreeing to provide funding, DOT acknowledged that Phase 2 would "effectively and efficiently serve the transportation needs of the corridor on the East Side of Manhattan between 106th Street and 125th Street," and that the cost is justified given the "mobility improvements, environmental benefits, cost effectiveness, land use, economic development effects, and congestion relief" that will result. FFGA at 1. Similarly, United States Secretary of Transportation Sean Duffy has not only described the Project as "important," but has stressed the need for it to "move forward and move forward fast."[2]

---

[1] "Ex. _" refers to exhibits to the Complaint.

[2] Chris Marquette, *'We're Not Trying to Shut Down These Projects,' Duffy Insists About NY Tunnels*, E&E News (Oct. 7, 2025), https://www.eenews.net/articles/were-not-trying-to-shut-down-these-projects-duffy-insists-about-ny-tunnels/.

In the FFGA, DOT agreed to fund 44.2% of the $7,699,030,840 Estimated Net Project Cost, amounting to a "Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution of $3,404,883,991." Ex. 1 at 1, FFGA § 8(c).[3] For its part, the MTA agreed to provide the remaining amount, calculated as $4,294,146,849, and "to undertake the activities necessary to Complete the Project." *Id.* § 4, Attach. 6.

In reliance on these binding commitments, in January 2024, the MTA awarded a major contract to relocate and upgrade existing infrastructure under Second Avenue. Patel Decl. ¶ 5. Similarly, in August 2025, the MTA entered into an approximately $1.972 billion agreement to bore two tunnels and associated cross passages from 120th Street and Second Avenue to 125th Street west of Park Avenue—a process involving 750-ton machines equipped with 22-foot diamond-studded drill heads tunneling between 35 to 120 feet below Second Avenue. *Id.* The August 2025 contract also covers the rehabilitation of existing tunnels from 106th to 120th Street, the excavation and construction of seven shafts for ancillary buildings and station entrances, and construction of the structural shells for the new 116th and 125th Street stations. *Id.*

Over the course of the next two years, the MTA implemented the Project, including by providing the funding that it had promised. *Id.* ¶ 6. DOT, in turn, honored its funding commitment by issuing reimbursements to the MTA within 30 days of each request (and typically much quicker than that). *Id.* The MTA submitted its first request for reimbursement under the FFGA on January 5, 2024 for $49,185,075.00, and DOT paid the reimbursement four days later on January 9, 2024. *Id.*

---

[3] DOT specifically obligated $450,000,000 in CIG Grant financial assistance for the Project and committed to make further obligations. FFGA § 8(a); Attach. 6. The obligation reflects a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received." GAO, A Glossary of Terms Used in the Federal Budget Process 70 (GAO–05–734SP, 2005). On September 9, 2024, DOT executed a further award obligating an additional $496,784,764 in CIG Grant funding for the Project, bringing the total amount obligated by DOT to $946,784,764. Ex. 2 at 86.

¶ 7; Ex. 4. Since then, up until September 30, 2025, DOT honored every one of the MTA's 94 subsequent requests for reimbursement within days of the request. Patel Decl. ¶ 7; Ex. 4.

>    **B.    The FFGA and Governing Regulations Impose Strict Payment Terms on DOT.**

As one would expect for a project of this size and complexity, the FFGA and associated regulations "establish a structured, orderly process for suspending or otherwise withholding the disbursement of funds." *GDC* at 16. Under the FFGA, DOT agreed to be bound by the terms and conditions in the Federal Transit Administration ("FTA") Master Agreement, which governs all awards and agreements entered by the FTA, as well as the regulations incorporated therein. FFGA § 1; Fed. Transit Admin. Master Agreement at 14 (Nov. 2, 2022) ("FTA Master Agreement" or "FTA Master Agmt.").[4] As a result, DOT must generally complete payment within 30 days of a reimbursement request and may only withhold funding in narrow circumstances, and only after providing the MTA with "an opportunity to cure any identified noncompliance." *GDC* at *14. As this Court recently explained, "DOT must follow a 'ready, aim, warning shot, aim again, fire' sequence" before it may suspend funding. *Id.* Nothing in the FFGA, or the FTA Master Agreement or regulations incorporated by reference in the MTA Master Agreement, authorize immediate withholding of federal assistance pending administrative review of the MTA's compliance with any federal law, regulation, or guidance.

Under the FTA Master Agreement, DOT specifically agreed to adhere to OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200. MTA Master Agmt. § 3(f)(1)(i). Pursuant to those regulations, "[w]hen the reimbursement method is used, the Federal agency . . . *must make payment within 30 calendar*

---

[4] *Available at* https://www.transit.dot.gov/sites/fta.dot.gov/files/2022-11/FTA-Master-Agreement-v30-2022-11-02_0.pdf.

*days* after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3) (emphasis added). Because the FFGA expressly states that DOT will use the reimbursement method, Section 200.305(b)(3)'s payment terms apply. *See* FFGA § 6(d) (reimbursement method); *id.* § 1 (incorporating by reference FTA Master Agreement); FTA Master Agmt. § 3(f)(1)(i) (2 C.F.R. Part 200 "applies to an Award").

The governing regulations are unambiguous: "[p]ayments for allowable costs *must not be withheld at any time* during the period of performance" unless "(i) [t]he recipient . . . has failed to comply with the terms and conditions of the Federal award; or (ii) [t]he recipient . . . is delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6) (emphasis added). In other words, the regulations provide that DOT "must not" withhold funds except in certain limited circumstances—none of which are present here. Under 2 C.F.R. § 200.339, DOT is prohibited from withholding funds unless it first finds that the alleged "noncompliance cannot be remedied by imposing specific conditions." 2 C.F.R. § 200.339. Even then, any withholding must be "[t]emporary," and last only until the recipient "takes corrective action." *Id.* § 200.399(a).

The FFGA similarly restricts DOT's authority to suspend funding. Under Section 19(a), DOT "may withhold its approvals of further funding and suspend drawdown of funds" only "[i]n the event that the Government determines that the Grantee is in breach of this Agreement," and even then, only for the period of time required for "any necessary corrective action." Section 19(b) of the FFGA, in turn, requires DOT to provide the MTA with 90 days' notice and "a reasonable period of time to respond and to take necessary corrective action" before withholding funding.

Finally, Section 11 of the FTA Master Agreement further provides that DOT may only suspend or terminate payments—after providing written notice and an opportunity to respond under FFGA § 19(b)—if DOT determines that: (1) the MTA "has failed to make reasonable

progress implementing the award"; (2) "continuing to provide federal assistance to support the Award does not adequately serve the purposes of the law authorizing the Award"; or (3) the MTA "has violated the terms of the [FFGA]." FTA Master Agmt. § 11(a).

### C.     The MTA's Disadvantaged Business Enterprise Program.

Congress first created the DBE program in 1983 in order to require DOT to promote equal opportunity for small businesses owned by socially and economically disadvantaged individuals. By statute, the program requires the Department to spend "not less than 10 percent" of authorized federal transportation funds on "small business concerns owned and controlled by socially and economically disadvantaged individuals." Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat. 429, 449; *see* 49 C.F.R. § 26.41.

As a condition of the FFGA, the MTA was required to develop and implement a plan for DBE participation. FTA Master Agmt. § 12(e); *see* 49 C.F.R. §§ 26.45-26.67 (2024). Accordingly, the MTA followed the requirements set forth in 49 C.F.R. Part 26 and federal guidance in effect at the time in establishing its DBE program, including following the then-applicable methodology established by DOT for determining the overall DBE goal.

Prior to September 30, 2025—the date that DOT suspended funding for the Project—DOT regulations provided that certain racial groups and women presumptively qualified as "socially and economically disadvantaged" for purposes of determining DBE ownership. 49 C.F.R. § 26.67(a)(1) (2024). That meant that state-operated Unified Certification Programs ("UCPs") could rely on that presumption as part of their analysis in determining whether to certify a DBE. On September 30, 2025, however, DOT issued the Disadvantaged Business Enterprise Interim Final Rule ("DBE IFR"),[5] which effectively reversed these regulations to remove race- and sex-

---

[5] DOT issued the DBE IFR on September 30 without either publishing a proposed rule or holding a public comment period. The DBE IFR went into effect a few days later, on October 3.

based presumptions of disadvantage and required DBE applicants to affirmatively "demonstrate social and economic disadvantage based on their own experiences and circumstances within American society, without regard to race or sex." 90 Fed. Reg. 47,971-72.[6]

### D.    DOT Suspends Reimbursements in Clear Violation of Its Obligations.

On September 30, 2025, the same day it issued the DBE IFR, DOT notified the MTA by letter that it was initiating a review of the Second Avenue Subway Disadvantaged Business Enterprise program (the "DBE Review") and that it would withhold all payments pending completion. Ex. 3 (the "September 30 Letter"). The September 30 Letter claimed that the DBE Review was necessary to assess the Project's compliance with the DBE IFR through which DOT had "remove[d] race- and sex-based presumptions of social and economic disadvantage from [DOT's] Disadvantaged Business Enterprise (DBE) program." *Id.* DOT informed the MTA that the DBE review would "*temporarily* impact disbursements for the Second Avenue Subway Project" and that, "[p]ending completion of the review, no further disbursements for the Project will be made." *Id.* (emphasis added).

What the September 30 Letter did not say is far more significant. The September 30 Letter did not state that DOT had made a determination that the MTA was in breach or had failed to comply with any law or the terms of the FFGA. *Id.* Nor did the September 30 Letter afford the MTA the contractually required notice and opportunity to cure any such breach before suspending payment. To the contrary, DOT informed the MTA that the review would be conducted "[i]n

James Leggate, *USDOT Removes Race and Sex from DBE Qualifications With Hard-Launched Rule*, ENGINEERING NEWS-RECORD (Oct. 9, 2025), https://www.enr.com/articles/61571-usdot-removes-race-and-sex-from-dbe-qualifications-with-hard-launched-rule.

[6] *See* DOT Office of Civil Rights Guidance, *DBE IFR Guidance* (Sept. 30, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-09/DBE%20IFR%20Guidance.9-30-2025.pdf.

conjunction" with the newly issued DBE IFR and "*will commence* immediately." *Id.* (emphasis added).

### E.    DOT's Administrative Review of the Project.

A week later, on October 7, 2025, DOT's Office of Civil Rights issued a formal request for information directing the MTA to provide within 14 days extensive information related to the MTA's DBE practices and policies, including the names and contact information for all minority- and women-owned contracts and subcontracts affiliated with the Project, the methodology by which the MTA awarded contracts for the Project, and whether the MTA considered race, sex, ethnicity, or national origin in making any awards. Ex. 5 at 1-2. DOT also requested information concerning the MTA's hiring and promotion policies, and the hiring and promotion policies of its contractors. *Id.* at 2. Finally, DOT directed the MTA to "identify any unawarded procurements" associated with the Project, and to outline "the steps MTA intends to take to ensure those procurements comply with the Equal Protection Principles of the U.S. Constitution, Federal nondiscrimination under civil rights laws, … and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunit*y." *Id.* at 2.

On October 21, 2025, the MTA responded by providing information and supporting documentation to address DOT's requests, and offering to cooperate with any requests for additional information. Ex. 6 at 1. The MTA explained that it "did not consider race or sex in the award" of Project contracts, and "did not participate in the award of any subcontracts, other than to approve the qualifications and responsibility of the firms presented by the prime contractor." *Id.* at 5. The MTA also explained that DBE contractors were certified by the New York UCP in compliance with 49 C.F.R. § 26.67, which at the time of certification, had "provided for a rebuttable presumption" of disadvantage based on race and sex pursuant to the governing DOT regulations. *Id.* However, pursuant to DOT's DBE IFR, the MTA indicated that it had advised its

9

contractors that the MTA had paused DBE participation requirements, and that they should be suspended until further notice. *Id.* at 2, 5.

In response to DOT's request for information about the MTA's hiring and promotion policies, the MTA emphasized its commitment to equal opportunity for all employees, "without regard to race, color, religion, national origin, sex, age, disability, genetic information, veteran or military status, or any other legally protected basis." *Id.* at 6. The MTA further stated that it "will not impermissibly use or rely on any protected category or characteristic," and provided a list of DBE-certified firms participating in the Project contracts awarded to date. *Id.* at 5-6. The MTA explained that it had "requested that contractors associated with the Project provide their [own] practices and policies related to workforce hiring and promotion," and provided the responses it had received. *Id.* at 5-6. Finally, the MTA identified two construction projects not yet awarded for the Project and stated that it was "in the process of updating all contract documents to ensure compliance with all recently enacted Executive Orders." *Id.* at 6-7.

On December 1, 2025, DOT issued a follow-up letter stating it had completed an "initial civil rights administrative review." Ex. 7 at 1. DOT announced, based on its review of the materials provided by the MTA and other publicly available sources, that "MTA and its prime contractors appear[ed] to have considered race and sex as part of both the prime and subcontract bidding and contract awards for the Project." *Id.* DOT specifically stated that the MTA's "use of 'Diversity Compliance' evaluation criteria" "appeared inconsistent with the Equal Protection principles of the U.S. Constitution." *Id.* This was a marked shift in tone from the prior communications. While DOT had previously requested information on the MTA's compliance with the *new* DBE requirements reflected in the DBE IFR going forward, now DOT was expressing concern as to whether the MTA had complied with the past, now superseded DBE rules.

10

In that same December letter, DOT wrote that while it "appreciates MTA's acknowledgement that it plans to comply with the Department's DBE Interim Final Rule," it requested that the MTA certify in writing that it had taken three principal actions as a condition to resuming funding distribution. *Id.* Those three actions were to: (1) "immediately cease the solicitation, collection or use" of bidders' or contractors' record of DBE participation, *id.* at 1-2; (2) work with other members of the New York UCP to develop and submit for approval a timeline for completing a DBE "reevaluation process" required under 49 C.F.R. § 26.111, *id.* at 2; and (3) "[t]o the extent any previously certified DBE contractor … fails to retain its DBE certification after" reevaluation, "take all necessary actions" within 60 days to ensure all Project contracts come into compliance with 49 CFR Part 26, including terminating and reletting as required. *Id.* at 2. In the letter, DOT requested a written certification from the MTA within 30 days that it accepts and will fulfill the conditions identified in the letter, stating that only if that occurred would DOT "recommence reimbursements for the Project." *Id.*

A little more than a week later, on December 10, 2025, the MTA responded by certifying compliance with each of DOT's three new conditions. Ex. 8. Specifically, the MTA certified that it "ha[d] or is ceasing the solicitation, collection, or use of any requirements that consider a bidder's or contractor's record of successful MWBE or DBE usage in connection with projects receiving funding from [DOT]"; that it had, "in concert with other members of the New York [UCP]," developed a comprehensive timeline for completing the required DBE reevaluation; and that any new contracts awarded by the MTA since the issuance of the DBE IFR had "been awarded with DBE goals of zero." *Id.* at 1.

11

Despite DOT's assurance that it would resume reimbursements for the Project "upon certification by MTA," *id.* at 2, DOT has not even acknowledged the MTA's written certification. Patel Decl. ¶ 13.

### F.   DOT Unlawfully Refuses to Pay More than $58 Million in Obligated Federal Assistance.

In the more than five months since the September 30 Letter, DOT has unlawfully withheld over $58 million in reimbursements.

Notwithstanding DOT's letter announcing its DBE review and unlawful suspension, the MTA continued to submit reimbursement requests through DOT's ECHO-Web payment system, as required by the FFGA and FTA Master Agreement. Between October 7, 2025 through October 23, 2025, the MTA submitted reimbursement requests totaling $2,000,106. Exs. 9-13.[7]

| Date | Amount Submitted |
|---|---|
| 10/7/2025 | $634,167.00 |
| 10/7/2025 | $36,260.00 |
| 10/8/2025 | $704,707.00 |
| 10/14/2025 | $617,221.00 |
| 10/23/2025 | $7,751.00 |
| TOTAL | $2,000,106 |

In an apparent attempt to avoid creating a record of its payment obligations, during a weekly meeting on October 28, 2025, DOT told the MTA to cease submitting reimbursement requests at all. Patel Decl. ¶ 9. Concerned about having a complete record in the event a case like this needed to be filed, the MTA nevertheless continued to submit reimbursement requests through DOT's online payment system, pursuant to the procedures set out in Section 7 of the FTA Master Agreement. *Id.* ¶ 10; *see* FTA Master Agmt. § 7(a),(f). From October 29, 2025 through January 28,

---

[7] The ECHO-Web online portal rounds the amounts submitted for reimbursement to a whole dollar figure. Accordingly, the MTA lists herein the individual dollar amounts as reflected in each ECHO-Web confirmation of reimbursement request page.

2026, the MTA submitted an additional 30 reimbursement requests, totaling $50,847,171.

*See* Exs. 14-43.

| Date | Amount Submitted |
|---|---|
| 10/29/2025 | $12,939.00 |
| 10/29/2025 | $58,607.00 |
| 10/30/2025 | $12,919.00 |
| 11/3/2025 | $1,085.00 |
| 11/5/2025 | $20,243.00 |
| 11/7/2025 | $11,741,217.00 |
| 11/7/2025 | $16,646,435.00 |
| 11/10/2025 | $38,093.00 |
| 11/12/2025 | $913,893.00 |
| 11/17/2025 | $257,114.00 |
| 11/19/2025 | $80,759.00 |
| 11/20/2025 | $1,423.00 |
| 11/21/2025 | $1,453,856.00 |
| 11/26/2025 | $7,816,377.00 |
| 12/1/2025 | $13,436.00 |
| 12/3/2025 | $2,004,726.00 |
| 12/4/2025 | $23,440.00 |
| 12/8/2025 | $1,151,988.00 |
| 12/10/2025 | $4,105.00 |
| 12/16/2025 | $6,530.00 |
| 12/22/2025 | $13,436.00 |
| 12/24/2025 | $784,755.00 |
| 12/30/2025 | $1,231.00 |
| 1/7/2026 | $799,132.00 |
| 1/12/2026 | $530.00 |
| 1/12/2026 | $88,672.00 |
| 1/15/2026 | $403,125.00 |
| 1/20/2026 | $992.00 |
| 1/27/2026 | $6,482,677.00 |
| 1/28/2026 | $13,436.00 |
| **TOTAL** | **$50,847,171** |

As a result, the current total amount in past due reimbursement requests from October 7, 2025 through January 28, 2026 is $52,847,277.

13

After the MTA's submission on January 28, 2026, DOT acted to suspend the grant in the ECHO-Web system used to submit reimbursement requests, and disable the MTA's ability to submit reimbursements. Patel Decl. ¶ 11. As of the date of this motion, DOT has physically prevented the MTA from submitting requests for reimbursement through DOT's payment processing system in an amount totaling $5,796,161.10. *See id.* ¶ 12.

| Date | Amount |
|------|--------|
| 2/6/2026 | $97,432.65 |
| 2/9/2026 | $2,147,897.83 |
| 2/10/2026 | $3,550,830.62 |
| **TOTAL** | **$5,796,161.10** |

The total amount owed by DOT to the MTA is $58,643,438.10.

### G. President Trump and DOT Officials Explicitly Describe the Suspension as Politically Motivated.

In its initial September 30 Letter, DOT claimed that it had suspended payments "[p]ending the completion" of an administrative review under DOT's DBE IFR. Ex. 3. The current Administration, however, has provided a very different explanation for DOT's refusal to pay lawfully obligated federal assistance. More specifically, on October 15, 2025, President Trump announced that funding had been suspended in order to put political pressure on Senate Minority Leader Chuck Schumer over the then-ongoing government shutdown.[8] DOT has likewise tied the suspension to the government shutdown, describing the funding suspension as a "casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal

---

[8] Chris Marquette & Ry Rivard, *Massive NY Tunnel and Subway Projects Still Alive, Official Says Despite Trump's Claims*, POLITICO (Oct. 16, 2025), https://www.politico.com/news/2025/10/16/gateway-and-second-ave-subway-projects-still-alive-despite-trump-comments-00611371.

immigrants benefits," and a result of "the Chuck Schumer and Hakeem Jeffries Shutdown."[9] At a press conference on October 15, 2025, President Trump implied that the true reason for the funding suspension did not have much (if anything) to do with DBE requirements, but was instead partisan, explaining that "we're getting rid of a lot of things that we never wanted because of the fact that [the Democrats] made this stupid move … Russell Vought is really terminating tremendous numbers of Democrat projects."[10] Neither the FFGA nor the FTA Master Agreement (or any of the governing regulations incorporated therein) permit DOT to withhold obligated funding for reasons wholly unrelated to the Project, including, of course, to punish the Administration's political opponents.[11]

Whatever the Administration's motivations really are, there is no question that DOT's continued suspension of funding has put the MTA in an untenable position by forcing it to divert funding from other critical transportation infrastructure priorities to plug the gap in federal assistance. If funding is not resumed, the MTA will likely soon be forced to delay final authorization of major contract awards necessary to finish the Project, demobilize construction crews, and cancel existing contracts, thereby creating a "domino effect" of cascading delays and inflated costs. *Beverly Hills Unified Sch. Dist.*, 2016 WL 4445770, at *11.

After more than 21 weeks of DOT's funding suspension, on February 25, 2026, the MTA sent DOT a letter requesting that DOT commit to restoring funding by March 6, 2026 and notifying

---

[9] DOT, *U.S. Dep't of Transp. Statement on Review of New York's Discriminatory, Unconstitutional Contracting Processes* (Oct. 1, 2025), https://www.transportation.gov/briefing-room/us-department-transportation-statement-review-new-yorks-discriminatory.

[10] The White House, *President Trump Participates in a Press Conference with the Director of the FBI*, at 39:42–57 (YouTube, Oct. 15, 2025), https://www.youtube.com/watch?v=f1M57bKXlKU&t=2806s.

[11] It would obviously be unconstitutional for DOT to "leverage funding to regulate speech outside the contours of the [funded] program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 570 U.S. 205, 214-15 (2013).

15

DOT of the MTA's intention to seek expedited judicial relief if DOT failed to do so. Patel Decl., Ex. 2. To date, the MTA has received no response. *Id.*

On March 17, 2026, the MTA filed the Complaint in this action. ECF 1 ("Compl."). The Complaint asserts four claims. Counts I – III seek damages for reimbursement payments that are past due under the FFGA. Specifically, Count I asserts a claim for breach of the FFGA for DOT's failure to pay reimbursement requests submitted through the ECHO-Web System, *id.* ¶¶ 130-58; Count II asserts a claim for breach of the FFGA for DOT's failure to pay remaining outstanding reimbursements, *id.* ¶¶ 159-83; Count III asserts a claim for DOT's breach of the duty of good faith and fair dealing implicit in the FFGA, *id.* ¶¶ 184-99. Count IV seeks consequential damages flowing from DOT's breach of the FFGA. *Id.* ¶¶ 200-09. On that same day, the MTA further moved for expedited briefing on its then-forthcoming Motion for Partial Summary Judgment on Counts I – III. ECF 3. The MTA's motion to expedite will be fully briefed on March 25, 2026. ECF 10.

## LEGAL STANDARD

"Summary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Clinchfield Coal Co. v. United States*, 105 Fed. Cl. 134, 135 (2012) (quoting *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987)). A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," at which point "the burden shifts to the non-moving party to 'designate specific facts showing that there is a genuine issue for trial.'" *Energy Nw. v. United States*, 69 Fed. Cl. 500, 503 (2006) (quoting *Novartis Corp. v. Ben Venue Lab'ys*, 271 F.3d 1043, 1046 (Fed. Cir. 2001)).

Contract claims in particular are "generally amenable to summary judgment." *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (quotation mark omitted). The "interpretation of a contract 'begins with the language of the written agreement.'" *Northstar Vermont Yankee, LLC v. United States*, 159 Fed. Cl. 575, 586 (2022) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000).

A "court may direct entry of a final judgment as to one or more, but fewer than all, claims" if it "expressly determines that there is no just reason for delay." RCFC 54(b). A court can also award contract damages at summary judgment in circumstances where there is no genuine dispute as to the amount owed. *See, e.g., Conn. Yankee Atomic Power Co. v. United States*, 142 Fed. Cl. 87, 90 (2019).

## ARGUMENT

### I. DOT BREACHED THE SAS2 AGREEMENT BY IMPROPERLY WITHHOLDING $58,643,438.10 IN REIMBURSEMENTS.

DOT's refusal to honor its funding obligations under the FFGA is a textbook breach of contract. The MTA has established each of the required elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Gilead Scis., Inc. v. United States*, 169 Fed. Cl. 210, 215 (2024) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).

The first two elements are beyond dispute: the FFGA is a valid agreement that mandates DOT reimbursements. *See supra* at 4. The last two elements are equally clear. Since September 30,

17

2025, DOT has improperly withheld $52,847,277.00 in past-due reimbursements submitted through the ECHO-Web Portal and blocked the submission of an additional $5,796,161.10. As this Court recently explained in the similar Gateway case, the relevant contract provisions mandate that DOT must follow "carefully scripted requirements" "*before* taking remedial action." *GDC* at 18 (emphasis added). Because the FFGA, the FTA Master Agreement, and the governing regulations do not authorize DOT to suspend funding based on some type of opaque and undefined "administrative review," this refusal is a breach as a matter of law and has caused the MTA damages in the amount of $58,643,438.10. *See id.* (GDC established a *prima facie* case for breach of contract because DOT "bypassed" the procedural steps specified in DOT's contracts).

### A. DOT Was Obligated to Honor Reimbursement Requests Within 30 Days of Each Request.

As noted above, the FFGA and regulations incorporated by reference in the FFGA require payment of a reimbursement request of eligible costs within 30 days. Under Section 200.305(b)(3), "[w]hen the reimbursement method is used, the Federal agency … *must make payment within 30 calendar days* after receipt of the payment request unless the Federal agency … reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3) (emphasis added). The FFGA here expressly states that DOT will use the "reimbursement method," thus Section 200.305(b)(3)'s payment terms apply. *See* FFGA § 6(d) (reimbursement method); *id.* 1 (incorporating by reference FTA Master Agreement); FTA Master Agmt. § 3(f)(1)(i) (2 C.F.R. Part 200 "applies to an Award").

As this Court already held with respect to the substantially identical funding agreement with Gateway, "DOT was [supposed] to provide" the MTA funds pursuant to Section 200.305(b)(3) "upon [the MTA's] application for reimbursements for covered costs." *GDC* at 15. Indeed, between the beginning of the Project in 2023 and the September 30, 2025 Letter, DOT paid $126,923,388 owed to the MTA under the FFGA across 95 different reimbursements, each within 30 days of the

18

MTA's submission of a request for reimbursement through ECHO-Web, never once missing a payment or even making a late payment. Patel Decl. ¶ 7. After September 30, 2025, however, all of the MTA's requests for reimbursements have not been paid, even after the 30-day deadline has passed. *See id.* ¶¶ 8-12; Exs. 3, 9-43.

### B.    DOT Cannot Rely on Its Ongoing "Review" to Justify Its Breaches.

As the Court explained in *GDC*, the language of the funding agreement and "applicable federal regulations establish a structured, orderly process for suspending or otherwise withholding the disbursement of funds" that "DOT must follow *before* it suspends disbursements." *GDC* at 16; *see also id.* ("DOT must follow a "'ready, aim, warning shot, aim again, fire' sequence"). DOT failed to comply with any of these requirements.

As an initial matter, the FFGA and federal regulations prohibit DOT from suspending funding unless it finds that the MTA is in breach of contract. *See supra* at 5-7. But DOT has never claimed that the MTA is in breach of contract. DOT's September 30 announcement that it was initiating a "review" made "no determinations at all, much less any of the determinations required by the agreements and regulations" to which it is bound. *GDC* at 17. And DOT has not made a determination of breach in any subsequent correspondence with the MTA. *See* Exs. 5, 7; Compl. ¶ 76. Indeed in *GDC*, DOT effectively conceded that it had not made a determination by arguing that it required discovery into GDC's compliance. *See GDC* at 18 n.10. As this Court explained, "[t]he issue is not whether GDC complied with federal law; the issue is whether DOT provided GDC with the process due under the agreements." *Id.*

What's more, DOT failed to provide notice and an opportunity to cure, as also required by the FFGA and regulations. *See supra* at 6. Section 19(b) of the FFGA requires DOT to provide the MTA with 90 days' notice and "a reasonable period of time to respond and to take necessary corrective action" before withholding funding. FFGA § 19(b). Not only did DOT fail to give the

MTA any opportunity to cure, it also did not make a "'determination' that any 'noncompliance cannot be remedied by imposing specific conditions,' as required by 2 C.F.R. § 200.339 before DOT can withhold disbursements." *GDC* at \*17.

### C. DOT Improperly Prevented the MTA from Seeking Reimbursement of $5,796,161.10.

DOT also breached its payment obligations with respect to the amounts that the MTA would have submitted through ECHO-Web had DOT not improperly shut off the MTA's access—itself another breach of the parties' contract and incorporated regulations.

After improperly instructing the MTA to cease submitting reimbursement requests, *as the MTA was obligated to do* under the FFGA and FTA Master Agreement, DOT decided to disable the MTA's ECHO-Web access. *See supra* at 14. In so doing, DOT breached the FTA Master Agreement, which limits the circumstances in which DOT may "revoke or suspend" a recipient's access to ECHO-Web. Compl. ¶ 41 (quoting FTA Master Agmt. § 7(f)(6)(i)). Had its access to ECHO-Web not been disabled, the MTA would have submitted additional requests for reimbursement on February 6, 9, and 10 in substantially the same form as the reimbursement requests that it previously submitted—and DOT paid—before DOT's September 30 Letter. *See supra* at 13.

Having wrongfully prevented the MTA from submitting these reimbursement requests through ECHO-Web, DOT obviously cannot complain that the MTA has failed to fulfill a condition precedent by not submitting the requests through ECHO-Web. Under the prevention doctrine, "where a party to a contract is the cause of the failure of the performance of the obligation due him or her, that party cannot in any way take advantage of that failure." *Park Props. Assocs., L.P. v. United States*, 82 Fed. Cl. 162, 171 (2008) (quoting II E. Allan Farnsworth, Farnsworth on Contracts § 8:6 (2d ed. 1998)). The prevention doctrine applies to the federal government, just as

20

it does to any private litigant. *See id.* (collecting cases). Because DOT wrongfully prevented the MTA from submitting the February 6, 9, and 10, 2026 reimbursement requests, it cannot "take advantage of that failure," by claiming (erroneously) that it has no duty to pay. *Id.*; *see also Bank of Advance v. United States,* 6 Cl. Ct. 535, 538 n.3 (1984) (defendant could not limit damages based on the failure of a client of the plaintiff bank to close a loan—a condition precedent in the contract between the bank and defendant—where defendant caused the loan not to be closed).

### D. DOT Owes $58,643,438.10 in Damages.

The record establishes the final element: damages. *San Carlos*, 877 F.2d at 959. DOT's failure to reimburse the MTA under the FFGA has caused direct financial harm equal to the value of the withheld payments. Specifically, the following reimbursement requests remain unpaid:

| Date | Amount Submitted |
|---|---|
| 10/7/2025 | $634,167.00 |
| 10/7/2025 | $36,260.00 |
| 10/8/2025 | $704,707.00 |
| 10/14/2025 | $617,221.00 |
| 10/23/2025 | $7,751.00 |
| 10/29/2025 | $12,939.00 |
| 10/29/2025 | $58,607.00 |
| 10/30/2025 | $12,919.00 |
| 11/3/2025 | $1,085.00 |
| 11/5/2025 | $20,243.00 |
| 11/7/2025 | $11,741,217.00 |
| 11/7/2025 | $16,646,435.00 |
| 11/10/2025 | $38,093.00 |
| 11/12/2025 | $913,893.00 |
| 11/17/2025 | $257,114.00 |
| 11/19/2025 | $80,759.00 |
| 11/20/2025 | $1,423.00 |
| 11/21/2025 | $1,453,856.00 |
| 11/26/2025 | $7,816,377.00 |
| 12/1/2025 | $13,436.00 |
| 12/3/2025 | $2,004,726.00 |
| 12/4/2025 | $23,440.00 |

21

| Date | Amount Submitted |
|---|---|
| 12/8/2025 | $1,151,988.00 |
| 12/10/2025 | $4,105.00 |
| 12/16/2025 | $6,530.00 |
| 12/22/2025 | $13,436.00 |
| 12/24/2025 | $784,755.00 |
| 12/30/2025 | $1,231.00 |
| 1/7/2026 | $799,132.00 |
| 1/12/2026 | $530.00 |
| 1/12/2026 | $88,672.00 |
| 1/15/2026 | $403,125.00 |
| 1/20/2026 | $992.00 |
| 1/27/2026 | $6,482,677.00 |
| 1/28/2026 | $13,436.00 |
| **TOTAL** | **$52,847,277.00** |

*See supra* at 12-14. But for DOT's wrongful termination of ECHO-Web access, the MTA would

have also submitted the following additional reimbursement requests:

| Date | Amount |
|---|---|
| 2/6/2026 | $97,432.65 |
| 2/9/2026 | $2,147,897.83 |
| 2/10/2026 | $3,550,830.62 |
| **TOTAL** | **$5,796,161.10** |

*See supra at* 14.

Accordingly, the MTA is entitled to damages reflecting the amount that has been unlawfully

withheld: $58,643,438.10.[12]

**II.      THE COURT SHOULD ENTER PARTIAL FINAL JUDGMENT FOR THE MTA IN THE AMOUNT OF $58,643,438.10.**

There is "no just reason" to delay final judgment on Counts I – III and the $58,643,438.10

in damages. RCFC 54(b). Because pre- and post-judgment interest is generally unavailable against

the government, *see* 28 U.S.C. § 2516(a), every day of delay results in an unrecoverable financial

---

[12] This amount reflects the total due as to Counts I – III based upon the exhibits submitted in connection with the Complaint, *see* Compl., Exs. 9-43, and is $99 higher than the total stated in our Complaint.

penalty for the MTA. In such circumstances, entering judgment and awarding damages "undeniably serves the ends of justice." *Conn. Yankee*, 142 Fed. Cl. at 91.

Indeed, in *Local Initiative Health Authority for Los Angeles County v. United States*, this Court directed partial final judgment on a breach of contract claim for $17 million because "the magnitude of the undisputed amount" owed meant there was no "just reason for allowing the Government to continue to evade its obligation to pay the uncontested damages." 145 Fed. Cl. 746, 751 (2019). That logic applies with even greater force here. The government has withheld over $58 million—more than triple the amount in *Local Initiative*—for over five months. This is not a mere accounting delay; it is a deprivation of funding for a massive public works project that employs thousands and will improve the daily commutes of tens of thousands.

What's more, final judgment on Counts I – III will assist the parties by providing greater clarity and certainty regarding their obligations under the FFGA going forward. Work on the Project continues to progress and the MTA intends to submit further reimbursement requests to support that work. A final judgment now will resolve the threshold legal disputes between the parties and establish a clear, predictable framework for the processing of future payment requests, hopefully avoiding the need for further piecemeal litigation as the Project moves toward completion. *See* Tr. of Status Conf. at 40-42, *GDC* (Fed. Cl. Feb. 24, 2026) (granting motion to expedite to provide the parties with certainty regarding their rights under DOT contract).

Finally, the MTA is not moving for summary judgment or final judgment on Count IV because it recognizes that discovery will be required to accurately assess the consequential damages caused by DOT's breach. The damages owed under Counts I – III, by contrast, are already readily established on the record before the Court.

23

## **CONCLUSION**

For these reasons, the Court should grant summary judgment to the MTA on Counts I – III

and enter final judgment for the MTA on Counts I – III in the amount of $58,643,438.10.


Dated: March 20, 2026
       New York, New York

Respectfully submitted,

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com


*Attorneys for Plaintiff*

24